ROBERT W. MATHERSON et al., Appellants, v ANTHONY MARCHELLO et al., Respondents.

Second Department, March 26, 1984

APPEARANCES OF COUNSEL

*Patrick Kevin Brosnahan, Jr.,* for appellants.

*Allen Wolfsont* for respondents.

**OPINION OF THE COURT**

TITONE, J. P.

In this defamation action, plaintiffs Robert W. Matherson and Carolyn E. Matherson appeal from an order of the Supreme Court, Suffolk County, which, upon a motion made pursuant to CPLR 3211 (subd [a], par 7), in effect dismissed their complaint for failure to state a cause of action. Plaintiffs were granted leave to replead, setting forth allegations of special damages. We hold that the statements complained of constitute libel, actionable without proof of special damages, and reverse.

On October 28, 1980, radio station WBAB conducted an interview with the members of a singing group called "The Good Rats". Following a commercial which advertised a

Halloween party at an establishment known as "OBI", a discussion ensued in which various members of the group explained that they are no longer permitted to play at OBI South because:

| | |
|---|---|
| "Good Rat #1: | Well, you know, we had that law suit with Mr. Matherson. |
| "A Good Rat: | And we used to fool around with his wife. |
| "Good Rat #1: | And we won. |
| "A Good Rat: | One of us used to fool around with his wife. He wasn't into that too much. |
| "D. J.: | Oh yea. |
| "Good Rat #1: (interrupted and joined by another Good Rat) | We used to start off our gigs over there with the National Anthem, and he was very upset about that, now all of a sudden he's very patriotic and he's using it in his commercials. |
| "A Good Rat: | I don't think it was his wife that he got so upset about, I think it was when somebody started messing around with his boyfriend that he really freaked out. Really. |
| | (Laughter) |
| | That did it man." |

Plaintiffs, who are husband and wife, subsequently commenced this action against "The Good Rats" (as individuals and against their record company), alleging that the words "we used to fool around with his wife" and "I don't think it was his wife that he got upset about, I think it was when somebody started messing around with his boyfriend that he really freaked out", were defamatory. They seek compensatory and punitive damages for humiliation, mental anguish, loss of reputation and injury to their marital relationship as well as for the loss of customers, business opportunities and good will allegedly suffered by Mr. Matherson. Special Term granted defendants' motion to dismiss, finding that the complaint failed to adequately

allege special damages. However, it gave plaintiffs leave to replead. Plaintiffs declined the opportunity and have appealed.

Preliminarily, we observe that if special damages are a necessary ingredient of plaintiffs' cause of action, Special Term properly found the allegations of the complaint to be deficient.

Special damages consist of "the loss of something having economic or pecuniary value" (Restatement, Torts 2d, § 575, Comment *b*) which "must flow directly from the injury to reputation caused by the defamation; not from the effects of defamation" (Sack, Libel, Slander, and Related Problems, § VII.2.2, 345-346; see, also, 1 Harper and James, The Law of Torts, § 5.14) and it is settled law that they must be fully and accurately identified "with sufficient particularity to identify actual losses" (*Lincoln First Bank v Siegel,* 60 AD2d 270, 280). When loss of business is claimed, the persons who ceased to be customers must be named and the losses itemized (*Reporters' Assn. v Sun Print. & Pub. Assn.,* 186 NY 437; *Continental Air Ticketing Agency v Empire Int. Travel,* 51 AD2d 104, 108). "Round figures" or a general allegation of a dollar amount as special damages do not suffice (*Drug Research Corp. v Curtis Pub. Co.,* 7 NY2d 435, 440; *Continental Air Ticketing Agency v Empire Int. Travel, supra,* p 108). Consequently, plaintiffs' nonspecific conclusory allegations do not meet the stringent requirements imposed for pleading special damages (*Zausner v Fotochrome,* 18 AD2d 649; Fuchsberg, 9 Encyclopedia of NY Law, Damages, § 243).

We must, therefore, determine whether an allegation of special damages is necessary. In large measure, this turns on which branch of the law of defamation is involved. As a result of historical accident, which, though not sensibly defensible today, is so well settled as to be beyond our ability to uproot it (*Ostrowe v Lee,* 256 NY 36, 39), there is a schism between the law governing slander and the law governing libel (see Restatement, Torts 2d, § 568, Comment *b;* see, also, *Gurtler v Union Parts Mfg. Co.,* 1 NY2d 5; 2 NY PJI 84 [1983 Supp]).[1]

---

1. The historical development is traced in Franklin, Cases and Materials on Tort Law and Alternatives (pp 884-886), and Veeder, The History and Theory of the Law of Defamation (3 Col L Rev 546; 4 Col L Rev 33). The distinction has, moreover, not gone

A plaintiff suing in slander must plead special damages unless the defamation falls into any one of four per se categories (see Prosser, Torts [4th ed], § 112, pp 751-760; Restatement, Torts 2d, § 570). Those categories consist of allegations (1) that the plaintiff committed a crime (*Privitera v Town of Phelps,* 79 AD2d 1; *Lander v Wald,* 218 App Div 514, affd 245 NY 590), (2) that tend to injure the plaintiff in his or her trade, business or profession (*Cruikshank v Gordon,* 118 NY 178; *Nadrowski v Wazeter,* 29 AD2d 741, affd 23 NY2d 899), (3) that plaintiff has contracted a loathsome disease (*Simpson v Press Pub. Co.,* 33 Misc 228) and (4) that impute unchastity to a woman (*Morrow v Wiley,* 73 AD2d 859; Civil Rights Law, § 77).[2] The exceptions were established apparently for no other reason than a recognition that by their nature the accusations encompassed therein would be likely to cause material damage (Prosser, Torts [4th ed], § 112, p 754).

On the other hand, a plaintiff suing in libel need not plead or prove special damages if the defamatory statement " 'tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society' " (*Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, quoting from *Sydney v Macfadden Newspaper Pub. Corp.,* 242 NY 208, 211-212; see, also, *Tracy v Newsday, Inc.,* 5 NY2d 134; *Hogan v Herald Co.,* 84 AD2d 470, 474, affd 58 NY2d 630).[3]

unchallenged. As early as 1812, a defendant urged that a libel read by one person should not be treated more harshly than a slander spoken to hundreds in a crowd. While the Judge conceded the merits of the argument, he refused to overturn the firmly rooted contrary precedents (*Thorley v Lord Kerry,* 128 Eng Rep 367; see 1 Harper and James, The Law of Torts, § 5.9, p 372; Comment, The Pre-*Thorley V. Kerry* Case Law of The Libel-Slander Distinction, 23 U Chi L Rev 132).

**2.** The first three categories were established relatively early. The fourth is of more recent vintage, having first been put into effect in England by the Slander of Women Act of 1891 (54 & 55 Vict, ch 51); similar statutory additions to the common law were made in this country (e.g., Civil Rights Law, § 77, derived from L 1871, ch 219, § 1; see, generally, 1 Harper and James, The Law of Torts, §§ 5.10-5.13; Prosser, Torts [4th ed], pp 754-760). We do not view these categories as fixed or rigid and, in appropriate circumstances, a new category may be judicially established (see, e.g., *Privitera v Town of Phelps,* 79 AD2d 1, 3; 2 NY PJI 85-86, 101-102 [1983 Supp], listing the imputation of homosexual behavior as a separate category of per se slander; contra, *Stein v Trager,* 36 Misc 2d 227).

**3.** We have avoided the use of the terms libel per se and libel per quod because, as explained in this footnote, the cases and commentators are divided on the question of whether any meaningful distinction exists between the two.

It is clear that when the defamatory import is apparent from the face of the publication itself without resort to any other source, the libel, often referred to as libel per se, is

Thus, unlike the law of slander, in the law of libel the existence of damage is conclusively presumed from the publication itself and a plaintiff may rely on general damages (compare Restatement, Torts 2d, § 569 with § 570; but see Excessiveness or Inadequacy of Damages for Defamation, Ann., 35 ALR2d 218, which suggests, by its scheme of classification, how relatively few cases of libel actually do arise which are not more or less easily referrable to the categories of slander per se).

To be sure, the common-law rule has been tempered by several decisions of the Supreme Court of the United States which preclude recovery of punitive damages absent a showing of malice in the constitutional sense, i.e., knowledge of the falsity of the statement or reckless disregard of the truth, and require a plaintiff to prove actual damages, interdicting recovery of presumed damages (see, e.g., *Wolston v Reader's Digest Assn.,* 443 US 157; *Herbert v Lando,* 441 US 153; *Time, Inc. v Firestone,* 424 US 448; *Gertz v Robert Welch, Inc.,* 418 US 323, 350; *New York Times Co. v Sullivan,* 376 US 254). Assuming, without deciding, that these limitations govern defamation suits against nonmedia defendants, an issue to be resolved shortly by the

---

actionable without proof of special harm (2 NY PJI 86 [1983 Supp]). Libel per quod, on the other hand, has been traditionally defined as an encompassing libel in which the defamatory import can only be ascertained by reference to facts not set forth in the publication (Prosser, Libel Per Quod, 46 Va L Rev 839).

In the view of some writers, libel per quod does not exist in New York. Under their reasoning, special harm is a necessary component only under the so-called "single instance" rule, i.e., where the statement charges the plaintiff with a single dereliction in connection with his or her trade or profession (see *Lyons v New Amer. Lib.,* 78 AD2d 723, app withdrawn 53 NY2d 704; *Shaw v Consolidated Rail Corp.,* 74 AD2d 985; *Amelkin v Commercial Trading Co.,* 23 AD2d 830, affd 17 NY2d 500; 2 NY PJI 97 [1983 Supp]). They read *Hinsdale v Orange County Pub.* (17 NY2d 284) as establishing that all other libel, whether defamatory on its face or by extrinsic fact, is actionable without proof of special harm (see Prosser, Torts [4th ed], § 112, p 762; 2 NY PJI 706-707).

Other commentators decline to interpret *Hinsdale (supra)* as obliterating the special harm requirements in extrinsic fact cases, viewing the pleading and proof of special damages as necessary both under the "single instance" rule and in extrinsic fact cases unless, with respect to extrinsic fact cases, it is "reasonably likely" that the plaintiff's reputation will be impaired among readers who are aware of the extrinsic facts (2 NY PJI 95-96 [1983 Supp]; see, e.g., Samore, New York Libel Per Quod: Enigma Still?, 31 Albany L Rev 250).

The cases simply state that if a libel is not per se, a plaintiff must plead and prove special damages as part of the prima facie case, without drawing a line of demarcation between them (see, e.g., *James v Gannett Co.,* 40 NY2d 415, 418; *Morrison v National Broadcasting Co.,* 19 NY2d 453, 458; *Ithaca Coll. v Yale Daily News Pub. Co.,* 85 AD2d 817, 818; *Garfinkel v Twenty-First Century Pub. Co.,* 30 AD2d 787, 788). Since neither the single instance rule nor extrinsic fact libel is involved, we have no opportunity to resolve the conflict.

Supreme Court (*Dun & Bradstreet v Greenmoss Bldrs.*, __ US __, 104 S Ct 389, granting petition for writ of cert to Supreme Ct of Vermont, 143 Vt 66; see 2 NY PJI 145 [1983 Supp], noting the conflict as to the reach of the *Gertz* case), we find that the cases which require a plaintiff to plead special damages, establish such actual malice, or suffer dismissal of the complaint (e.g., *Newsday, Inc. v Peck Contr.*, 87 AD2d 326, app dsmd 57 NY2d 885; *France v St. Clare's Hosp. & Health Center*, 82 AD2d 1, app withdrawn 56 NY2d 593; *Salomone v MacMillan Pub. Co.*, 77 AD2d 501, 502), cut far too broadly and their analysis has been rejected by the Court of Appeals.

In *Hogan v Herald Co.* (84 AD2d 470, 480-481, *supra*), then Justice SIMONS, writing for a unanimous Appellate Division, Fourth Department, observed that "the Supreme Court did not limit actual damages to out-of-pocket or pecuniary damage: loss of reputation, humiliation and mental anguish are also compensable * * * Thus, contrary to defendants' contention, plaintiff need not establish either actual malice or special damages before he may recover". That appeal arose from a determination of a motion for summary judgment and, due to a lack of proof of actual malice, the claim for punitive damages was dismissed (84 AD2d, at p 481). As to compensatory damages, however, allegations of injury to " 'credit and reputation' " and scorn, ridicule and harassment resulting in " 'extreme emotional distress and anguish' " and loss of " 'earnings of approximately $2,000.00, legal fees of $1,500.00, and other special damages as shall be proven at trial, *together with general damages of $500,000.00*' " (emphasis supplied) were held to "sufficiently claim actual injuries and though they must be proved at trial * * * they need not be supported by affidavit proof on [a motion for summary judgment]" (84 AD2d, at p 481). On appeal by permission of the Appellate Division, Fourth Department, on a certified question, the Court of Appeals affirmed "for reasons stated in the opinion by Justice RICHARD D. SIMONS at the Appellate Division" (58 NY2d 630, 632, *supra;* see, also, *Blumenstein v Chase*, 100 AD2d 243 [decided herewith]).

The pleadings in the case before us mirror those in *Hogan* and *Blumenstein (supra).* Because there is no requirement that the plaintiff establish an evidentiary basis

for the allegations of the complaint on a motion to dismiss made pursuant to CPLR 3211 (see *Guggenheimer v Ginzburg,* 43 NY2d 268, 275; *Rovello v Orofino Realty Co.,* 40 NY2d 633, 635-636; *Holly v Pennysaver Corp.,* 98 AD2d 570), the constitutional limitations on damages recoverable in a defamation action do not furnish a predicate for sidestepping the question of the branch of the law of defamation involved, the question to which we now return.

Traditionally, the demarcation between libel and slander rested upon whether the words were written or spoken (1 Harper and James, The Law of Torts, § 5.9, p 375; Prosser, Torts [4th ed], § 112, p 752). Written defamations were considered far more serious because, at the time the distinction arose, few persons could read or write and, therefore, anything which was written would carry a louder ring of purported truth (Franklin, Cases and Materials on Tort Law and Alternatives [2d ed], p 898). In addition, a written defamation could be disseminated more widely and carried a degree of permanence.

With the advent of mass communication, the differential was blurred. Motion pictures were held to be libel (*Brown v Paramount Publix Corp.,* 240 App Div 520). No set rule developed with respect to radio and television (1 Harper and James, The Law of Torts, § 5.9, p 376; § 5.18, pp 406-408; Prosser, Torts [4th ed], § 112, pp 753-754). In some cases, a distinction was drawn between contemporaneous speech, which was classified as slander, and words read from a script, which were classified as libel (see, e.g., *Hartmann v Winchell,* 296 NY 296; *Hryhorijiv v Winchell,* 180 Misc 574, affd 267 App Div 817; *Locke v Gibbons,* 164 Misc 877, affd 253 App Div 887). This distinction was the subject of considerable criticism (see, e.g., Donnelly, Defamation by Radio: A Reconsideration, 34 Iowa L Rev 12; *Hartmann v Winchell, supra,* pp 300-304 [FULD, J., concurring]) and was rejected by later cases which adopted a libel classification irrespective of the use of a script (e.g., *Shor v Billingsley,* 4 Misc 2d 857, affd 4 AD2d 1017).

We today hold that defamation which is broadcast by means of radio or television should be classified as libel. As we have noted, one of the primary reasons assigned to justify the imposition of broader liability for libel than for

slander has been the greater capacity for harm that a writing is assumed to have because of the wide range of dissemination consequent upon its permanence in form. Given the vast and far-flung audiences reached by the broadcasting media today, it is self-evident that the potential harm to a defamed person is far greater than that involved in a single writing (see *Hartmann v Winchell,* 296 NY 296, 304, *supra* [FULD, J., concurring]). Section 568A of the Restatement of Torts, Second, and the more recent decisions in sister States (Defamation by Radio or Television, Ann., 50 ALR3d 1311, §§ 3-5, pp 1325-1329) opt for holding such defamation to be libel and we perceive no basis for perpetuating a meaningless, outmoded, distinction.

On the question of whether the allegedly defamatory statements are actionable, our scope of review is limited. "If the contested statements are reasonably susceptible of a defamatory connotation, then 'it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader' " (*James v Gannett Co.,* 40 NY2d 415, 419, quoting *Mencher v Chesley,* 297 NY 94, 100; cf. *Gurda v Orange County Pub. Div.,* 81 AD2d 120, 130 [dissenting opn of MOLLEN, P. J., and TITONE, J.], revd 56 NY2d 705 on dissent at App Div). We must accord the words their natural meaning and we cannot strain to interpret them in their mildest and most inoffensive sense in order to render them nondefamatory (e.g., *November v Time Inc.,* 13 NY2d 175, 178-179; *Schermerhorn v Rosenberg,* 73 AD2d 276, 283-284; *Nowark v Maguire,* 22 AD2d 901). Unless we can say, as a matter of law, that the statements could not have had a defamatory connotation, it is for the jury to decide whether or not they did (*Schermerhorn v Rosenberg, supra; Greenberg v CBS Inc.,* 69 AD2d 693).

Taken in the context of a rock and roll station's interview with musicians, and taking note of contemporary usage, we have no difficulty in concluding that the words "fooling around with his wife" could have been interpreted by listeners to mean that Mrs. Matherson was having an affair with one of the defendants. Such charges are clearly libelous on their face, thus obviating any need to allege

and prove special damages (see Civil Rights Law, § 77; *James v Gannett Co., supra,* p 419).[4] While it may be possible to construe the words in an inoffensive manner, since they are susceptible of a defamatory connotation, the cause of action should stand (cf. *Schermerhorn v Rosenberg, supra; Greenberg v CBS Inc., supra; Jordon v Lewis,* 20 AD2d 773, 774).

The second comment — "I don't think it was his wife that he got upset about, I think it was when somebody started messing around with his boyfriend that he really freaked out" — presents a far more subtle and difficult question (see Imputation of Homosexuality as Defamation, Ann., 3 ALR4th 752). It is plaintiffs' contention that this statement constitutes an imputation of homosexuality which should be recognized as defamatory. Defendants, on the other hand, basically do not deny that such reading is plausible. Rather, they claim that many public officials have acknowledged their homosexuality and, therefore, no social stigma may be attached to such an allegation. We are constrained to reject defendants' position at this point in time.

It cannot be said that social opprobrium of homosexuality does not remain with us today. Rightly or wrongly, many individuals still view homosexuality as immoral (see *Newsweek,* Aug. 8, 1983, p 33, containing the results of a Gallup poll; cf. *People v Onofre,* 51 NY2d 476, 488, n 3, cert den 451 US 987). Legal sanctions imposed upon homosexuals in areas ranging from immigration (*Matter of Longstaff,* 716 F2d 1439) to military service (*Watkins v United States Army,* 721 F2d 687) have recently been reaffirmed despite the concurring Judge's observation in *Watkins* (p 691) that it "demonstrates a callous disregard for the progress American law and society have made toward

---

4. Defendants' contention that section 77 of the Civil Rights Law is unconstitutional because it confers a defamation per se cause of action upon a female but not a male is not properly before us. Constitutional issues not raised at Special Term may not be considered on appeal (see *Melahn v Hearn,* 60 NY2d 944, 945; *Matter of Eagle v Paterson,* 57 NY2d 831, 833; *Barber v Dembroski,* 54 NY2d 648, 650). Moreover, the requisite statutory notification has not been given to the Attorney-General (CPLR 1012, subd [b]; Executive Law, § 71), which constitutes an independent procedural bar to appellate review (*Roberts v Gross,* 100 AD2d 540; *Emmer v Emmer,* 69 AD2d 850, 851; *Matter of Carter v Carter,* 58 AD2d 438, 442, n 1). In any event, the accepted method for resolving the issue would appear to be to read the statute as gender neutral (see *Matter of Lisa M. UU. v Mario D. VV.,* 78 AD2d 711; *Matter of Carter v Carter, supra,* p 445).

acknowledging that an individual's choice of life style is not the concern of government, but a fundamental aspect of personal liberty" (see, also, Comment, Challenging Sexual Preference Discrimination in Private Employment, 41 Ohio St LJ 501; Comment, Homosexual Parent in Custody Disputes, 5 Queens LJ 199; Rivera, Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States, 30 Hast LJR 799; but see *Curran v Mount Diablo Council of Boy Scouts,* 147 Cal App 3d 712 [under California law a person cannot be expelled from the Boy Scouts simply because he is homosexual]).

In short, despite the fact that an increasing number of homosexuals are publicly expressing satisfaction and even pride in their status, the potential and probable harm of a false charge of homosexuality, in terms of social and economic impact, cannot be ignored. Thus, on the facts of this case, where the plaintiffs are husband and wife, we find, given the narrow scope of review, that the imputation of homosexuality is "reasonably susceptible of a defamatory connotation" (*James v Gannett Co.,* 40 NY2d 415, 419, *supra*) and is actionable without proof of special damages (cf. *Nowark v Maguire,* 22 AD2d 901, *supra*).

For these reasons, the order should be reversed insofar as appealed from, with costs, the defendants' motion to dismiss should be denied and the complaint should be reinstated.

THOMPSON, BRACKEN, and RUBIN, JJ., concur.

Order of the Supreme Court, Suffolk County, dated April 8, 1982, reversed insofar as appealed from, with costs, defendants' motion to dismiss the complaint denied, and complaint reinstated. Defendants' time to answer is extended until 20 days after service upon them of a copy of the order to be made hereon, with notice of entry.