WILLIAM POLLNOW et al., Appellants, v POUGHKEEPSIE NEWS-
PAPERS, INC., Respondent, and ANNA BARTELEMUCCI, Ap-
pellant.

Second Department, February 4, 1985

## APPEARANCES OF COUNSEL

*Richard B. Wolf* for appellants.

*Meiselman, Farber, Stella & Eberz, P. C.* (*Michael Kolb* and *Myra I. Packman* of counsel), for appellant.

*Van De Water & Van De Water* (*Susanna E. Bedell* of counsel), for respondent.

## OPINION OF THE COURT

TITONE, J.

■■ In this defamation action, predicated upon the publication of three allegedly libelous letters to the editor of the *Poughkeepsie Journal,* the Supreme Court, Dutchess County, granted summary judgment to the defendant newspaper and denied that branch of a cross motion by the author of the letters to dismiss the complaint against her. We conclude that the "gross[] irresponsib[ility]" standard of liability (*Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199) is applicable and the procedural posture of this case dictates that the first cause of action be dismissed and the order otherwise affirmed.

I

Sometime in April 1981, plaintiff Otto Pollnow, then 16 years of age, physically attacked defendant Anna Bartelemucci's daughter, whom we shall refer to as AW, at AW's home. It appears that Pollnow was a friend of AW's son.

According to an April 29, 1981 article which appeared in the *Millbrook Round Table,* a weekly news journal, Pollnow later reported to the police station with his father and told the authorities that he was under the influence of "Angel Dust" and could not recall his actions. In addition, the article noted that AW's husband had discovered a knife stuck in a hassock in the living room of their home and that he had turned the knife over to the authorities. AW could not recall if a knife was used in the attack. Pollnow was arraigned on assault charges, pleaded not guilty, and was scheduled to appear in court on May 5, 1981.

On April 27, 1981, Pollnow was suspended from high school by the Millbrook Superintendent of Schools based on the criminal charge. Between April 27, 1981 and June 15, 1981, the Pollnows attempted, through school hearings and appeals to the New York State Commissioner of Education, to obtain their son's reinstatement to his high school classes. On June 15, 1981, the Commissioner overruled the school board's refusal to reinstate Pollnow and held that his suspension was improperly imposed. The Commissioner issued a second order to the same effect on

October 30, 1981, directing the school board to comply with his earlier order.

While the assault charges were pending and the school reinstatement proceedings were in progress, defendant Bartelemucci wrote three letters to the *Poughkeepsie Journal,* a periodical owned by defendant Poughkeepsie Newspapers, Inc., for publication in its letters to the editor column. These three letters, which are reproduced in the appendix, form the basis of this defamation action. Among other things, the letters recite what Mrs. Bartelemucci perceives to be a "lax" police investigation and a faulty Grand Jury proceeding in connection with the attack on her daughter. No specific mention is made of Otto Pollnow.

Pollnow's attorney contacted the managing editor of the *Poughkeepsie Journal* and took "strong exception" to the publication of Bartelemucci's letters. He claimed that the letters contained "false and inaccurate statements relating to the aforementioned alleged criminal act and subsequent criminal proceedings", and that the newspaper must be held accountable for Bartelemucci's libelous statements.

In May 1982, Pollnow was acquitted of the misdemeanor assault charge involving AW. The nonjury trial had been closed to the public because of Pollnow's status as a "youth" and the record was ordered sealed. Nonetheless, both Mrs. Bartelemucci and the defendant newspaper allege upon information and belief that the acquittal was based upon the trial court's determination that Pollnow lacked the requisite *mens rea* to commit the assault because he was under the influence of "Angel Dust" at the time.

Subsequently, Pollnow and his parents commenced this action. The amended complaint asserts four separate causes of action. The first three causes of action against Bartelemucci allege that she (1) failed to exercise proper care and acted negligently in writing and publishing the "false" letters thereby injuring Otto Pollnow; (2) acted "negligently, maliciously and with a reckless disregard for the truth of the matters she asserted in the letters, thereby deliberately injuring Otto Pollnow"; and (3) acted "with a willful and malicious intent to influence Millbrook school officials" by writing and publishing the letters to the editor thereby injuring Pollnow's reputation among his peers and in the community. The fourth cause of action against Poughkeepsie Newspapers, Inc., alleges "that by publishing the letters, without proper attempts to verify their accuracy, the Poughkeepsie Journal acted negligently and with-

out the care required of newspapers concerning letters to the editor, thereby injuring Otto Pollnow".

By notice of motion dated October 4, 1982, Poughkeepsie Newspapers, Inc., sought summary judgment dismissing the amended complaint pursuant to CPLR 3211 (c). In support of that motion, Poughkeepsie Newspapers, Inc., submitted the affidavits of its president and former managing editor, and affidavits from the editor and the former editor of its editorial page. The affidavits indicate that the letters authored by Bartelemucci were considered to be matters of public concern and thus worthy of publication. They also contain a concession that no inquiry was made upon receipt of the letters to determine their accuracy since there was no "reference point" in the letters which could have been verified because the writer did not name or identify the teen-age assailant in any way and there was no identifiable connection between Bartelemucci and Pollnow. Finally, it was urged that summary disposition was appropriate because plaintiffs did not allege or submit any evidence to establish that the newspaper was "grossly irresponsible" in publishing the letters.

By notice of cross motion, Bartelemucci sought, among other things, an order dismissing the amended complaint pursuant to CPLR 3211 (a) (7) for failure to state a cause of action. Bartelemucci claimed that since plaintiffs did not allege that she acted in a "grossly irresponsible" manner in writing the subject letters, dismissal of the amended complaint was appropriate.

In opposition to these motions, plaintiffs did not tender any evidentiary affidavits. Instead, they relied upon the amended complaint, which was verified by Otto Pollnow's mother, and a memorandum of law submitted by their attorney.

Special Term granted the newspaper's motion for summary judgment and dismissal but denied that branch of Bartelemucci's cross motion which sought dismissal. We now modify, by dismissing the first cause of action, and otherwise affirm, employing a somewhat different rationale than the one espoused at nisi prius.

II

Historically, the tort of defamation was characterized by strict liability (*see,* Eaton, *The American Law of Defamation Through Gertz v Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va L Rev 1349; Veeder, *The History and Theory of the Law of Defamation,* 3 Colum L Rev 546). English common law declared intention to be irrelevant; the question was stated to be who was

hit, not who was aimed at (*Jones v Hulton & Co.,* 2 K.B. 444 [1909]; *see, Corrigan v Bobbs-Merrill Co.,* 228 NY 58).[1] Recognizing that strict liability "too often discouraged the publication of the truth about matters of general public concern" (Keeton, *Defamation and Freedom of the Press,* 54 Tex L Rev 1221, 1226) and that strict liability collided with the First Amendment's guarantee of "a fertile and continuing source of supply for the marketplace of ideas from which an intelligent and informed populace may choose its own course" (*Schermerhorn v Rosenberg,* 73 AD2d 276, 283), the United States Supreme Court, beginning with the landmark *New York Times Co. v Sullivan* (376 US 254) decision, placed limitations on the right of the States to award damages for defamation. It is now basic that public officials and public figures must establish malice in the constitutional sense, i.e., that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of the truth, before they may recover damages (*e.g.,* Prosser and Keeton, Torts § 113, at 806 [5th ed]; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, *cert denied* 434 US 969).[2]

For individuals who are neither public officials nor public figures, the applicable standard was somewhat elusive. A delicate balance had to be struck "between the individual's right to protect his good name and the guarantees of the First Amendment which safeguard the people's right to an active, thriving and untrammeled press" (*Gurda v Orange County Pub. Div. of Ottaway Newspapers,* 81 AD2d 120, 130 [opn of Mollen, P. J., and Titone, J., concurring and dissenting in part], *revd* 56 NY2d 705 on opn of Mollen, P. J., and Titone, J.). Abandoning the plurality approach of *Rosenbloom v Metromedia* (403 US 29), the Supreme Court struck that balance in *Gertz v Robert Welch, Inc.* (418 US 323, 247), holding "that so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual" and that presumed and punitive damages were interdicted absent a

1. Commentators are divided as to whether *Jones v Hulton & Co.* (2 K.B. 444 [1909], which purported to restate the English rule of strict liability, comported with prior precedent (*compare,* Smith, *Jones v. Hulton: Three Conflicting Judicial Views as to a Question of Defamation,* 60 U Pa L Rev 365, *with* Holdsworth, *A Chapter of Accidents in the Law of Libel,* 57 LQ Rev 74).

2. Although some cases appear to blur the distinction (*e.g., Hollander v Long Is. Plastic Surgical Group,* 104 AD2d 357), it is evident that malice in the constitutional sense differs from the common-law concept of ill will or spite which defeats a qualified privilege (*see, Hogan v Herald Co.,* 84 AD2d 470, 475, n 2, *affd* 58 NY2d 630; *compare, e.g., Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, *with Stukuls v State of New York,* 42 NY2d 272, 279).

showing that the *New York Times* standard had been met (*see, Matherson v Marchello,* 100 AD2d 233, 237-238; *Hogan v Herald Co.,* 84 AD2d 470, 480-481, *affd* 58 NY2d 630; *Maheu v Hughes Tool Co.,* 569 F2d 459).[3]

Since *Gertz* (*supra*) set only a minimum constitutional standard, the States were, of course, free to protect defendants to a greater extent. While most States have apparently chosen not to do so, adhering to common-law principles to the extent permitted by *Gertz* (*see, Peagler v Phoenix Newspapers,* 114 Ariz 309, 560 P2d 1216, and cases cited therein; *Embers Supper Club v Scripps-Howard Broadcasting Co.,* 9 Ohio St 3d 22, 457 NE2d 1164, 1167; *Miami Herald Pub. Co. v Ane,* 458 So 2d 239 [Fla]; *cf. Gaynes v Allen,* 128 Mich App 42, 339 NW2d 678; *Bichler v Union Bank & Trust Co.,* 745 F2d 1006, 1013 [adhering to *New York Times* standard under Michigan law]), New York adopted a unique standard in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199, *supra*), in which the Court of Appeals held that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish * * * that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (*see also, Gaeta v New York News,* 62 NY2d 340, 348-349; *Greenberg v CBS Inc.,* 69 AD2d 693, 710).

Although it is plain that plaintiff Otto Pollnow is neither a public official nor a public figure, it is equally plain that a private person's alleged criminal conduct and the operation of the criminal justice system with respect to the disposition of the charges against such an individual are matters of legitimate public concern (*see, Robart v Post-Standard,* 52 NY2d 843; *Carlucci v Poughkeepsie Newspapers,* 88 AD2d 608, *affd* 57 NY2d 883; *Grobe v Three Vil. Herald,* 69 AD2d 175, *affd* 49 NY2d 932; *Brown v Johnson Newspapers Corp.,* 84 AD2d 636; *cf. Gaeta v New York News, supra,* p 349). Consequently, it is clear that the defendant newspaper's liability is to be measured by the

---

**3.** It is interesting to note that the abandonment of strict liability in defamation actions is contrary to the trend in other areas of tort law, such as products liability. One commentator suggests that an enterprise theory of strict liability may be a more appropriate direction for defamation law (Weiler, *Defamation, Enterprise Liability and Freedom of Speech,* 17 U Toronto LJ 278). Other commentators, however, observe that the analogy is flawed and that enterprise liability is inapt (*e.g.,* Anderson, *Libel and Press Self-Censorship,* 53 Tex L Rev 422, 432, n 52).

16

principles of *Chapadeau (supra)* and *Gertz (supra)* (*see, Defamation: Publication of "Letter to Editor" in Newspaper as Actionable*, Ann., 99 ALR3d 573).

■ As to the individual defendant, Anna Bartelemucci, the issue is not as clearcut. Neither the Supreme Court nor the Court of Appeals has authoritatively spoken on the question of whether the constitutional limitations apply to nonmedia defendants (*see, Matherson v Marchello, supra,* pp 237-238, noting the pendency of *Dun & Bradstreet v Greenmoss Bldrs.,* __ US __, 104 S Ct 389; Prosser and Keeton, Torts § 113 [5th ed]; Watkins and Schwartz, *Gertz and the Common Law of Defamation: Of Fault, Nonmedia Defendants, and Conditional Privileges,* 15 Tex Tech L Rev 823; *cf. Hutchinson v Proxmire,* 443 US 111, 133, n 16 [opn of Burger, Ch. J.]). Whatever may be the rule with respect to purely private defamations having no nexus to the public media, we conclude, as have virtually all State and lower Federal courts passing on the issue (*see,* Nimmer, *Introduction — Is Freedom of the Press a Redundancy: What Does it Add to Freedom of Speech?,* 26 Hastings LJ 639, 649, n 57), that a nonmedia individual defendant who utilizes a public medium for the publication of matter deemed defamatory should be accorded the same constitutional privilege as the medium itself (*see also,* Watkins and Schwartz, *op. cit.,* 15 Tex Tech L Rev 823).

The policy basis for doing so is particularly strong when the concern is with letters to the editor of a newspaper. As Lord Denning put it, "[w]hen a citizen is troubled by things going wrong, he should be free to 'write to the newspaper': and the newspaper should be free to publish his letter. It is often the only way to get things put right * * * [Neither the writer nor the newspaper] should * * * be deterred by fear of libel actions" (*Slim v Daily Tel.,* [1968] 1 All ER 497, 503; *see also,* Martin, *Libel and Letters to the Editor,* 9 Queens LJ 188; Ann., 99 ALR3d 573 § 4). Indeed, we applied the *Gertz* principles in *Blumenstein v Chase* (100 AD2d 243), where a letter to the editor was claimed to be defamatory, and we perceive no reason to abandon that holding now.

III

■ Measured by the standards set forth above, it is evident that the action was properly dismissed as to the defendant newspaper. The newspaper properly sought summary judgment[4]

4. The newspaper's notice of motion explicitly requested, and thus put plaintiffs on notice, that it was seeking summary judgment. The request was repeated in each of the supporting affidavits. In such circumstances, Special Term was not required to provide notice to the parties if it chose to treat the preanswer motion as one for summary judgment (*see, O'Hara v Del Bello,* 47

and under the " 'gross irresponsibility' standard * * * the existence of the privilege alone is enough to support a grant of summary judgment in favor of the defendant in the absence of some circumstance that would justify an inference of fault" (*Karaduman v Newsday, Inc.,* 51 NY2d 531, 551; *see also, Gaeta v New York News,* 62 NY2d 340, 350-351, *supra; cf. Kerwick v Orange County Pub. Div. of Ottaway Newspapers,* 53 NY2d 625; *Greenberg v CBS Inc.,* 69 AD2d 693, 710, *supra*).

Even if the letters were not entirely accurate, plaintiffs failed to demonstrate a triable issue as to whether the newspaper " 'acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties' " (*Robart v Post-Standard,* 52 NY2d 843, 845, *supra,* quoting from *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199, *supra; see also, Gaeta v New York News, supra,* p 351; *Cera v Gannett Co.,* 47 AD2d 797; *Kruteck v Schimmel,* 27 AD2d 837). The author of the letter was identified, its contents did not purport to defame a specified individual,[5] and there was no basis to doubt the factual accuracy of the letter (*see, El Paso Times v Trexler,* 447 SW2d 403 [Tex]; *Desert Sun Pub. Co. v Superior Ct.,* 97 Cal App 3d 49, 158 Cal Rptr 519; *Safarets, Inc. v Gannett Co.,* 80 Misc 2d 109, *affd* 49 AD2d 666 on opn at Special Term; Ann., 99 ALR3d 573).

A failure to investigate the truth or falsity of a statement in a letter to the editor does not, ipso facto, constitute gross irresponsibility (*El Paso Times v Trexler, supra; Safarets, Inc. v Gannett Co., supra*). In any event, all reasonable means which could have been utilized to confirm the veracity of Mrs. Bartelemucci's letters would have been futile. Mrs. Bartelemucci would have obviously vouched for their accuracy. Otto Pollnow was not then identified as the "teen-age boy" referred to in the letters and plaintiffs remained silent until after *all* of the letters were published.

With respect to Mrs. Bartelemucci, however, our scope of review is much narrower. She made a cross motion to dismiss the amended complaint, rather than a motion for summary judgment, thus limiting our inquiry to whether the amended complaint states *any* cause of action against her; we cannot

NY2d 363, 367-368; *Monteferrante v New York City Fire Dept.,* 63 AD2d 576, *affd* 47 NY2d 737 on mem at App Div; 4 Weinstein-Korn-Miller, NY Civ Prac par 3211.44).

**5.** If the gross irresponsibility test had been met, however, on the record before us the facts would have been sufficient to require jury resolution of whether the letters were " 'of and concerning' " the plaintiffs (*Cera v Gannett Co.,* 47 AD2d 797, 798).

examine the record for an evidentiary basis (*see, e.g., Guggenheimer v Ginzburg,* 43 NY2d 268, 275; *Matherson v Marchello,* 100 AD2d 233, 238-239, *supra; Holly v Pennysaver Corp.,* 98 AD2d 570, 571-572). The amended complaint must be liberally construed in the light most favorable to the plaintiffs and all factual allegations accepted as true (*Morone v Morone,* 50 NY2d 481, 485; *Holly v Pennysaver Corp.,* 98 AD2d 570, 572, *supra*).

Although Bartelemucci's cross motion to dismiss the amended complaint did seek dismissal of each and every cause of action, it also made a pinpointed challenge to each individual claim and the failure of each claim to allege gross irresponsibility. Consequently, we treat her motion as applying to each cause of action separately (*Martirano Constr. Corp. v Briar Contr. Corp.,* 104 AD2d 1028; Siegel, NY Prac § 265, at 325).

By this yardstick, the first cause of action, which seeks recovery on a simple negligence theory, is plainly insufficient and must be dismissed. While the second and third causes of action do not specifically allege "gross irresponsibility" on Bartelemucci's part, there are sufficient allegations from which a cause of action predicated on such a theory, if established, would lie. Plaintiffs allege, for example, that "Bartelemucci acted negligently, maliciously and with a reckless disregard for the truth of the matters she asserted in the letters" and have adequately alleged actual damages (*see, Matherson v Marchello, supra,* p 238; *Hogan v Herald Co.,* 84 AD2d 470, 480-481, *affd* 58 NY2d 630, *supra*). While the pleading may not be a model of clarity and, absent evidentiary support, would not survive a motion for summary judgment (*see, Gaeta v New York News,* 62 NY2d 340, 351, *supra*), at this juncture it meets the minimum requirements for stating a cause of action.

For these reasons, the order should be modified by dismissing the first cause of action. As so modified, the order should be affirmed insofar as appealed from, with one bill of costs to defendant Poughkeepsie Newspapers, Inc., payable by plaintiffs.

MOLLEN, P. J., BRACKEN and RUBIN, JJ., concur.

Order of the Supreme Court, Dutchess County, dated March 11, 1983, modified, on the law, by granting that branch of defendant Anna Bartelemucci's cross motion as sought dismissal of the amended complaint as against her to the extent of dismissing the first cause of action against her. As so modified, order affirmed insofar as appealed from.

Defendant Poughkeepsie Newspapers, Inc., is awarded one bill of costs payable by plaintiffs. No costs are awarded for or against defendant Bartelemucci.

APPENDIX

# Trooper investigation faulted

TO THE EDITOR:

I have been reading about the death of Mr. Sappe. I could not believe what the family went through. Now I do.

About a month ago, a teen-age boy, a friend of my grandson, came into my daughter's home and attacked her with a knife. As she held the hand he had the knife in, he beat her with his free hand. She was black and blue about the face, chest and arms. She also had three cuts on her nose and a bump behind her ear.

A neighbor took her to her husband's garage, and he took her to the State Police barracks in Washington Hollow. This was within minutes of the assault.

She told her story to a female trooper and signed a statement. The trooper sent my daughter's husband to the house to find the knife. He found it with the handle broken, and took it back to the trooper. Now, it seems, it won't count because her husband found the knife.

If a trooper had been sent to her home, he would have found the knife, and this would have made a difference. No trooper went to the home or questioned her neighbors. I think this was very lax.

The incident happened at 3:10 p.m., and he was picked up after 7 p.m. The excuse was they could do nothing until they talked to the judge who would not be home from work until 5:30 or 6 p.m., to get a warrant to arrest the boy. This gave the boy four hours to do a lot worse, since he claims to have been on Angel Dust.

My daughter will not stay home alone. She is on tranquilizers, and plans to go to the Mental Health Clinic for help. The boy has not been to school since it happened. His parents want him back in school. Do you want him back in school with your children?

He tried to stab my daughter. What will he do next? Write to the Millbrook school board, and let them know how you feel.

ANNA BARTELEMUCCI,
Millbrook

# Questions grand jury's decision

TO THE EDITOR:

I read in the Journal on Oct. 19 that a jury selection was to begin in the trial of a man who hit another man in the head with a pair of handcuffs. He is charged with second-degree assault. They are calling it a felony.

My daughter was attacked by a teen-age boy in her home with a knife. He beat her about the face, head, and chest. No trooper went to her home to look for the knife. The one witness was questioned a month later. When my daughter made her statement, the trooper told her to make it brief. If my daughter had not

gotten away from this boy she could have been killed.

My daughter went before the grand jury last month. The jury brought in a verdict of a misdemeanor. I hope that some of you who made that decision knew what you were doing. How could you come to this decision when you did not know the whole story? You may remember my daughter, Mrs. W of Millbrook, who did not get a chance to tell her story. If she did, you may have brought in a different verdict. Could this be called a mistrial?

MRS. ANNA BARTELEMUCCI,
Wappingers Falls, N.Y.

# Thanks for justice

TO THE EDITOR:

I would like to thank Judge Vincent Massarelli for not dismissing the charges against a teenager who attacked my daughter in her home with a knife.

There should be more people like Judge Massarelli who has a mind of his own and wants to see justice done. Thank you again.

ANNA BARTELEMUCCI
Wappingers Falls