Roger W. KIRBY, Plaintiff,

v.

Daniel WILDENSTEIN and Fondation Wildenstein, Defendants.

No. 89 Civ. 1418 (LBS).

United States District Court, S.D. New York.

Feb. 24, 1992.

Beigel & Sandler, Ltd. (Lewis S. Sandler, of counsel), New York City, for plaintiff.

Shearman & Sterling (Jeremy G. Epstein, Karen M. Crupi, of counsel), New York City, for defendants.

## OPINION

SAND, District Judge.

Plaintiff Roger Kirby has brought this diversity action against Daniel Wildenstein and the Fondation Wildenstein (together "Wildenstein") alleging the tort of product disparagement. Presently before us is Wildenstein's motion for summary judgment. For the reasons discussed below, Wildenstein's motion is granted.

### Background

A. *Factual History.*

Plaintiff is the owner of a painting entitled "La Rue de la Paix" (hereinafter the "Painting") painted by the nineteenth century French artist Jean Beraud. Defendant Daniel Wildenstein is a world-renowned art expert and Director of defendant Fondation Wildenstein,[1] a not-for-prof-

it corporation organized under French law that engages in art historical research and publishes catalogues of the works of French artists. The gravamen of plaintiff's complaint is that Wildenstein made false and disparaging statements about the Painting that prevented its sale at a scheduled auction and left it "burned" and otherwise devalued thereafter.

The facts relevant to Wildenstein's motion for summary judgment are as follows. In 1988, plaintiff looked into the possibility of selling the Painting and approached several auction houses and art dealers toward that end. One of the auction houses was Christie, Manson & Woods International, Inc. (hereinafter "Christie's"), and on March 3, 1988, plaintiff entered into a consignment agreement with Christie's. Christie's set a reserve price, or minimum price at which the Painting would be sold, of $160,000, and the Painting was scheduled to be offered at Christie's May 25, 1988 auction.

At the same time, Patrick Offenstadt, the recognized expert on Jean Beraud, was preparing a "catalogue raisonne" of the artist's works. A catalogue raisonne is regarded as a definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonne serves to authenticate the work, while non-inclusion suggests that the work is not genuine. Offenstadt was preparing the Beraud catalogue under the auspices of Fondation Wildenstein.

One of the terms of the consignment agreement between plaintiff and Christie's provided that Christie's would communicate with Offenstadt to verify that the Painting would be included in the forthcoming Beraud catalogue raisonne. *See* Affidavit of Karen M. Crupi in Support of Defendants' Motion for Summary Judgment, January 7, 1991, Exh. H (hereinafter "Crupi Aff."). Polly Sartori, the vice-president of Christie's 19th Century European Paintings Department and the Christie's representative with whom plaintiff dealt,

1. In 1990, Fondation Wildenstein was renamed "Institut Wildenstein." Because the parties and the Court have referred to the corporation as "Fondation Wildenstein" throughout the litigation, however, we will continue to refer to it by that name herein.

told plaintiff that she intended to include the Offenstadt reference in Christie's sales catalogue for the May 25, 1988 auction and that the Painting could not be sold without the reference. Plaintiff had no objection to Sartori's communicating with Offenstadt.

On March 16, 1988, Sartori wrote to Offenstadt at Fondation Wildenstein, seeking confirmation that the Painting would appear in the catalogue raisonne. Christie's included a color transparency of the Painting and suggested that Offenstadt arrange a viewing. Instead of traveling to New York to examine the Painting himself, Offenstadt asked Wildenstein to look at it. Wildenstein is a renowned expert on nineteenth century art, including the works of Beraud, and had seen approximately 200 paintings by Beraud other than the Painting owned by plaintiff. Wildenstein agreed to view the Painting during an April 1988 trip to New York, and asked Sartori to send the Painting to Wildenstein & Company, his gallery in New York. Sartori obliged, and Wildenstein examined the Painting.

During his examination, Wildenstein scrutinized the Painting for some twenty minutes, looking at both the front and the back and observing the Painting from various distances. According to his deposition testimony, Wildenstein observed that the canvas had been relined and that the figures in the Painting were more blurred than those of other Berauds he had seen. As a result, he concluded that the Painting was either "skinned," meaning that it had suffered the removal of paint through overcleaning, or a copy. See Crupi Aff., Exh. B, Deposition of Daniel Wildenstein, Oct. 9, 1990, at 41, 59–60 (hereinafter "Wildenstein Dep.").

On May 5, 1988, Offenstadt informed Sartori by telex that the Painting would not be included in the forthcoming catalogue raisonne. An employee of Wildenstein & Company, Joseph Baillio, also told Sartori that Wildenstein did not like the Painting and did not believe it was genuine. See Crupi Aff., Exh. E, Deposition of Polly J. Sartori, Oct. 26, 1989, at 60 (hereinafter "Sartori Dep."). Sartori decided to withdraw the Painting from the May 25, 1988 auction.

Although Sartori had removed the Painting from the May auction, she believed that it was genuine. Sartori wrote to the Paris-based art dealer Bernheim–Jeune et Cie, whose label was affixed to the back of the Painting, seeking confirmation of its authenticity. Bernheim–Jeune provided documents showing that he had purchased the Painting directly from Beraud in 1907. Sartori forwarded the documents to Fondation Wildenstein along with a letter dated June 10, 1988, and asked that Wildenstein reevaluate his opinion with respect to the Painting's authenticity.

By letter dated June 20, 1988, Fondation Wildenstein informed Sartori that Wildenstein had received the Bernheim–Jeune documents and revised his opinion as to the genuineness of the Painting. The letter stated that the Painting would be listed in the forthcoming catalogue raisonne as an authentic Beraud, but would bear a notation that the Painting had been damaged by "an abusive restoration and cleaning." The letter further stated that the notation as to condition should be included in Christie's sales catalogue. ·

After receiving the June 20, 1988 letter, Sartori sent the Painting to the Julius Lowy Frame Restoring Company (hereinafter "Lowy"), an expert in art restoration, for an opinion as to its condition. Lowy examined the Painting under natural and ultraviolet light, and issued the following report:

> Original canvas has been relined and attached to another canvas with an animal glue wheatpaste adhesive. This lining is in stable condition. There is some abrasion along the bottom edge of the painting and in the darker more thinly painted areas such as around the central figure and on some of the building moldings. Some of the abrasion has been covered with a glaze by a previous restorer. There is a layer of discolored varnish and dirt trapped underneath.

Crupi Aff., Exh. R. Sartori enclosed a copy of the Lowy report in a letter to Fondation Wildenstein dated July 6, 1988,

and stated that while Christie's would not include a reference to the Painting's condition in its sales catalogue, it would make the Lowy report available to any prospective purchasers.

Christie's included the Painting in its auction scheduled for October 26, 1988. The Christie's sales catalogue for that auction stated that the Painting would be listed in the forthcoming Beraud catalogue raisonne, but did not make any reference to its condition. There were no bidders for the Painting at the October 26, 1988 auction, and the Painting did not sell. Plaintiff has made no further efforts at resale since the auction, *see* Transcript of Oral Argument, May 16, 1991, at 28 (hereinafter "Transcript"), and still owns the Painting.

### B. *Procedural History.*

On March 1, 1989, plaintiff commenced this action against Wildenstein, alleging the tort of product disparagement and seeking damages of $250,000. Following the completion of discovery, Wildenstein moved for summary judgment, raising five principal arguments: (1) that there was no publication of the statements to outside parties; (2) that there was no evidence of malice; (3) that there was no evidence of special damages; (4) that the statement regarding condition was true; and (5) that the statements were absolutely privileged even if disparaging in light of plaintiff's consent.

On July 12, 1991, this Court issued a memorandum endorsement addressing Wildenstein's argument that plaintiff had failed to plead special damages. *See* Memorandum Endorsement dated July 12, 1991 (hereinafter "Memorandum Endorsement"). Although we agreed that plaintiff's allegations of special damages were "particularly inadequate," *id.* at 2, we granted plaintiff an opportunity to submit an amended complaint and affidavits specifically dealing with the issue of special damages. Decision was reserved on all other aspects of Wildenstein's motion.

Plaintiff has since filed an amended complaint and a supplemental affidavit, and Wildenstein has submitted a response. With those further submissions in mind, we now turn to the merits of Wildenstein's motion.

### *Discussion*
### A. *The Standard for Summary Judgment.*

In deciding Wildenstein's motion for summary judgment, this Court must review the pleadings, depositions, and affidavits on file to determine whether there are any genuine issues of material fact or whether Wildenstein is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Although the record must be viewed in the light most favorable to the nonmoving party, *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987), "the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### B. *Elements of Product Disparagement.*

■ The phrase "product disparagement" refers to words or conduct which tend to disparage or reflect negatively on the quality, condition or value of a product or property. *See* 44 N.Y.Jur. Defamation and Privacy § 175 at 189–90. In order to prevail on his claim of product disparagement, plaintiff must establish the following four elements: (1) the falsity of Wildenstein's statements; (2) publication to a third person; (3) malice; and (4) special damages. *Angio–Medical Corp. v. Eli Lilly & Co.,* 720 F.Supp. 269 (S.D.N.Y.1989) (applying New York law); *Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319, 323 (1960).

Wildenstein's motion challenges the sufficiency of plaintiff's showing as to each of these elements, and claims further that even if plaintiff has made out a prima facie case of product disparagement, Wildenstein's statements were absolutely privi-

leged. Because our earlier Memorandum Endorsement addressed the deficiencies in plaintiff's allegation of special damages, however, and because we find that those deficiencies have not been cured by plaintiff's further submissions, we confine our discussion to that issue.

### C. *Special Damages.*

■ The rules surrounding the pleading and proof of special damages are stringent and well-articulated. Special damages are limited to losses having pecuniary or economic value, and must be "fully and accurately stated," *Drug Research,* 7 N.Y.2d at 440, 199 N.Y.S.2d at 37, 166 N.E.2d at 323, "with sufficient particularity to identify actual losses." *Matherson v. Marchello,* 100 A.D.2d 233, 473 N.Y.S.2d 998, 1001 (2d Dept.1984). In addition to this particularity requirement, special damages must be the "natural and immediate consequence of the disparaging statements" to be recoverable. *Angio–Medical,* 720 F.Supp. at 274; *Cambridge Assoc. v. Inland Vale Farm Co.,* 116 A.D.2d 684, 497 N.Y.S.2d 751, 753 (2d Dept.1986) (special damages must be "related causally to the alleged tortious acts").

The requirement of pleading and ultimately proving special damages "goes to the cause of action itself and not merely to the recovery." As a result, a "plaintiff will be denied even nominal or punitive damages if he cannot show special damage, since in such a case no cause of action at all is established." Prosser & Keeton on Torts, 5th ed. (1984 & supp.1988), § 128 at 971. Courts considering product disparagement claims have therefore applied this requirement strictly, granting motions to dismiss or for summary judgment for failure to allege special damages with the requisite specificity. *See, e.g., Angio–Medical, supra; Drug Research, supra; Chris-*

*topher Lisa Matthew Policano, Inc. v. North American Precis Syndicate, Inc.,* 514 N.Y.S.2d 239 (1st Dept.1987); *Lincoln First Bank v. Siegel,* 60 A.D.2d 270, 400 N.Y.S.2d 627 (4th Dept.1977).

Wildenstein argues that plaintiff has failed to adhere to the stringent requirements imposed by the special damage rule, and that no rational jury could find for plaintiff on this element. *See* Wildenstein's Memorandum of Law at 14–15. After reviewing plaintiff's amended complaint and the depositions and affidavits on file, we agree that plaintiff has not put forth sufficient evidence of special damages to survive the motion for summary judgment.

The original complaint in this action sought damages of $250,000, plus damages for lost use of the money with interest from May 25, 1988 and the costs of bringing this action. The complaint did not specify the losses underlying the $250,000 figure or state the present value of the Painting, which plaintiff still owns. Nor did the complaint identify any particular person who would have bid on the Painting but did not do so because of the alleged disparagement.[2] Instead, plaintiff alleged only that a similar painting by Beraud had sold at a spring 1988 auction for slightly more than the anticipated range of $160,000 to $200,000 (Complaint ¶ 23); that Wildenstein had initiated a "whispering campaign" about the Painting that led at least one unnamed potential bidder to express doubts about the marketability of the Painting's title (*see* Complaint ¶ 24); and that plaintiff's experts would probably say at trial that the Painting was now worth no more than $10,000, if it could be sold at all (Transcript at 28–29). These vague allegations of damages, clearly inadequate in light of the rule that special damages be stated with particularity, prompted our Memorandum En-

---

**2.** The complaint alleged that during the days leading up to the October 26, 1988 auction, "Christie's reported that someone from Sotheby's and another individual had seen the Painting and each had separately said that he understood that the title was unmarketable." Complaint ¶ 24. During her deposition, Ms. Sartori testified that only one collector informed her that "he had heard that there might be a prob-

lem" with the Painting, Sartori Dep. at 121, but refused to disclose the identity of that client. During the deposition, the attorneys for the parties discussed the possibility of naming the individual collector in the context of a protective order. *Id.* at 72–74. Whether or not that course of action was pursued is unclear, but the parties make no further reference to it in the memoranda submitted in connection with this motion.

dorsement stating that summary judgment would be granted if plaintiff's amended complaint and supporting affidavits did not identify the plaintiff's pecuniary losses with greater specificity. *See* Memorandum Endorsement at 3.

Despite our having provided plaintiff with the opportunity to cure these defects, plaintiff's further submissions fail to convince us that his allegation of special damages presents a triable issue of fact. Plaintiff has submitted an amended complaint, but that amended pleading differs from the original complaint only at paragraph 27, which states that the Painting would not have sold for more than $80,000 at the time of the October 26, 1988 auction and for $50,000 in the present market, and in the *ad damnum* clause, which now seeks $200,000 dollars instead of $250,000. Plaintiff has also submitted a supplemental affidavit by Polly Sartori, which confirms only that: she placed pre-sale estimates on the Painting in 1988 ranging from $160,000–$220,000; there were no bidders on the Painting at the October 26, 1988 auction; and that "prices for works of fine art generally, and nineteenth century European paintings in particular, have declined" so that the Painting would sell today for an amount between $50,000 and $70,000. *See* Affidavit of Polly J. Sartori, Oct. 8, 1991 (hereinafter "Sartori Aff."). The affidavit also states that in "[her] opinion, the actions taken by Fondation Wildenstein with respect to the authentication of the painting had an adverse effect on the salability of the painting." *Id.*

Wildenstein argues that plaintiff's further submissions still fail to satisfy the requirement that specific proof of pecuniary loss be shown. Wildenstein points out that plaintiff has not named any person who would have bid on the painting but did not do so because of the alleged disparagement, and cites *Drug Research* as establishing a rule that "If the special damage [is] a loss of customers ... the persons who ceased to be customers, or who refused to purchase, must be named ... [I]f they are not named, no cause of action is stated. *Drug Research*, 7 N.Y.2d at 441, 199 N.Y.S.2d at 37, 166 N.E.2d at 323 (cita-

tion omitted). Wildenstein further argues that plaintiff's new claim for $200,000 in losses is too conclusory to satisfy the requirement that special damages be stated in detail, and again cites *Drug Research* for the principle that "Such round figures, with no attempt at itemization, must be deemed to be a representation of general damages." *Id.*

The rule articulated in *Drug Research*—that lost customers must be *named* where the special damages claimed are lost sales—is well-entrenched and has been consistently followed. *See, e.g., Mullenmeister v. Snap–On Tools Corp.*, 587 F.Supp. 868, 875 (S.D.N.Y.1984); *Sbrocco v. Pacific Fruit, Inc.*, 565 F.Supp. 15, 17 (S.D.N.Y. 1983); *Matherson v. Marchello*, 473 N.Y.S.2d at 1001; *Continental Air Ticketing Agency, Inc. v. Empire Int'l Travel, Inc.*, 51 A.D.2d 104, 380 N.Y.S.2d 369, 372 (4th Dept.1976). While the above rule does seem to be routinely followed by courts applying New York law, however, at least one court has questioned the wisdom of requiring a plaintiff to name lost customers where the circumstances make it "virtually impossible to identify those who did not order the plaintiff's product" because of the alleged disparagement. *See Charles Atlas, Ltd. v. Time–Life Books, Inc.*, 570 F.Supp. 150, 156 (S.D.N.Y.1983).

In that case, *Charles Atlas v. Time–Life, Inc.*, the plaintiff sold only by mail orders to a widely dispersed and somewhat amorphous market. Judge Goettel cited with approval Dean Prosser's view that:

"It is probably still the law everywhere that [a plaintiff] must either offer the names of those who have failed to purchase or explain why it is impossible for him to do so; but where he cannot, the matter is dealt with by analogy to the proof of lost profits resulting from breach of contract. If the possibility that other factors have caused the loss of the general business is satisfactorily excluded by sufficient evidence, this seems entirely justified by the necessities of the situation."

*Id.* (citing W. Prosser, Handbook of the Law of Torts § 128, at 923–24 (4th ed. 1971).

Even if one were to accept this more lenient view of the plaintiff's burden of showing special damages, plaintiff's complaint must fall. First, there is no showing of a decline in "general business." Plaintiff's allegations that another work by the same artist sold at a higher price or that the market in fine art generally has subsequently declined are a far cry from a showing of declining sales for an established product. Moreover, as we show *infra,* plaintiff has hardly sustained the burden which Dean Prosser would impose on plaintiff of sufficiently excluding another cause of the loss, *i.e.,* the quality and condition of the Painting itself.

In light of these distinctions from the *Charles Atlas* case, we conclude that plaintiff's allegations of special damages are still too generalized to survive dismissal. As Wildenstein notes in its letter response to plaintiff's further submissions: "Kirby has not submitted the itemized proof of damages the law requires; he has merely substituted one round number for another." *See* Wildenstein's Letter Response Dated Oct. 18, 1991 at 3. Such round numbers, as stated clearly in *Drug Research,* may not qualify as special damages.

■ Perhaps equally important, and closely related to this continued pleading deficiency, is plaintiff's failure to demonstrate that any losses were causally related to Wildenstein's statements, as he must. *See, e.g., Waste Distillation Technology v. Blasland & Bouck Eng'rs, P.C.,* 523 N.Y.S.2d 875, 877 (2d Dept.1988) (allegation of special damages inadequate where "plaintiff has failed to sufficiently allege that any losses incurred were causally related to the defendant's letter"); *Cambridge Assoc.,* 497 N.Y.S.2d at 753 (special damages must be "related causally to the alleged tortious acts"). Wildenstein insists that he disclosed the statements only to Christie's and to Offenstadt, Baillio, and

Sylvia Brossais, a Fondation Wildenstein employee working on the Beraud catalogue raisonne. While the latter three disclosures are technically adequate to constitute publication, none of those parties were potential purchasers of the Painting, and there is no evidence that they circulated the statements to outside parties. Plaintiff has therefore had to rely on a theory that Wildenstein or its agents engaged in a "whispering campaign" designed to disparage the Painting.

Whatever the strength of plaintiff's conviction that such a "whispering campaign" occurred, the record before us indicates that there is no evidence supporting it. Plaintiff admits that the only "fact" supporting the theory is "the fact[] that there's no other source that would've made that statement," Kirby Dep. at 155, though Sartori concedes that the statements could have been disseminated by one of the Christie's employees with whom she discussed Wildenstein's opinions,[3] or by Sotheby's, a rival auction house that had disparaged works put up for auction at Christie's in the past. Sartori Dep. at 144. Thus, despite Sartori's statement in the supplemental affidavit that the actions taken by Wildenstein with respect to authentication "had an adverse effect on the salability of the Painting," Sartori herself testified previously that she "never thought" that any disparaging statements about the Painting emanated from Wildenstein. *Id.* at 124.

In sum, even assuming that any disparaging statements regarding the Painting reached the ears of a potential customer, there is no evidence whatsoever that the statements were circulated by defendants or any of their employees. That lack of evidence, combined with the possibility that any potential purchasers did not bid on the Painting simply because of the quality and condition of the painting itself, persuades us that plaintiff has failed to demonstrate that any losses he sustained were causally related to the allegedly disparaging statements.

---

**3.** Sartori in fact testified that one of her colleagues had discussed Wildenstein's opinions with a representative of the William Doyle Galleries, another auction house, and that she herself had discussed the statements with an individual collector. Sartori Dep. at 75–76, 78.

## Conclusion

As the above discussion reflects, plaintiff's further submissions have failed to demonstrate a triable issue of fact with respect to special damages. Instead, they reveal that plaintiff has neither pleaded nor provided any evidence supporting this element, on which he would bear the burden of proof at trial. Accordingly, Wildenstein's motion for summary judgment is granted.

SO ORDERED.