ROBERT J. McRELL ASSOCIATES,
INC., Plaintiff,

v.

INSURANCE COMPANY OF NORTH
AMERICA, Defendant.

No. 86 Civ. 0005 (RWS).

United States District Court,
S.D. New York.

Dec. 23, 1987.

Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for plaintiff; Robert A. Wolf, of counsel.

Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, New York City, for defendant; Thomas A. Martin, Virginia B. Curry, of counsel.

## OPINION

SWEET, District Judge.

Defendant Insurance Company of North America ("INA") has moved for summary judgment under Rule 56, Fed.R.Civ.P., dismissing the complaint of plaintiff Robert J. McRell Associates, Inc. ("McRell"). McRell has similarly moved for partial summary judgment granting the relief sought in the first two causes of action set forth in the complaint. Both motions will be granted in part and denied in part as set forth below based upon the following findings and conclusions.

### Prior Proceedings

This action was commenced in the state court in December 1985 and removed to this court on January 2, 1986. McRell moved for preliminary injunctive relief to bar INA from direct communication with the local agents who had participated through McRell in certain plans that had been insured by INA. After a hearing and an oral opinion setting forth findings and conclusions, the request for injunctive relief was denied on January 8, 1986.

Following discovery and the submission of affidavits and Local Rule 3(g) statements, oral argument was heard on September 11, 1987. Except where noted, the facts are not in dispute.

## FINDINGS

### The Parties

McRell is a New Jersey corporation with its principal place of business located at the Middlesex Business Center in South Plainfield, New Jersey. McRell designs, promotes, administers and manages insurance programs on behalf of industry associations, and contracts with local insurance agents and brokers who place insurance policies through McRell on behalf of subscribers to such programs. In 1984 INA, a Pennsylvania corporation with its principal place of business in New York City became the insurance carrier of the insurance program that is the subject of this action.

### The UBOA and NSTA Programs

In March 1979, McRell was retained by the United Bus Owners of America ("UBOA") to serve as UBOA's Insurance Coordinator for a period of ten (10) years. McRell's responsibilities as Insurance Coordinator were to provide, maintain and develop programs of insurance beneficial to the UBOA membership. UBOA is a major nationwide bus association with members in approximately 49 states and the District of Columbia who own charter buses, municipal buses, tour and sightseeing buses, airport transportation vehicles and other passenger transportation services.

McRell designed and developed an insurance program ("UBOA Program") to pro-

vide automobile liability, automobile physical damage, general liability, excess liability, workers' compensation and related insurance coverage to UBOA members. Between September 1979 and June 1980, Guarantee Insurance Company was the underwriting carrier of the UBOA Program which was administered by McRell. From July 1980 through June 1983, National Union Fire Insurance Company of Pittsburgh, Pennsylvania was the carrier of the UBOA Program, and from July 1983 through June 1984, Central National Insurance Company of Omaha served as carrier. At all times, McRell continued as the developer and administrator of the UBOA Program.

In December 1981, McRell also became the administrator of a second insurance program run on behalf of members of the National School Transportation Association ("NSTA") (the "NSTA Program"), which, at the time, was also insured by National Union. The NSTA Program afforded NSTA members insurance coverage similar to that offered UBOA members under the UBOA Program.

*INA as Underwriter of the Programs*

In the spring of 1984, McRell communicated with various insurance carriers and their agents to explore their interest in becoming the underwriting carrier of the UBOA and NSTA Programs (the "Programs") commencing July 1, 1984. In June 1984, INA made a proposal to act as the underwriting carrier of the Programs which included a commitment of a minimum of three years to the Program.[1] At a meeting in INA's offices in New York City, INA, McRell and Contractors Planning Group, the liaison broker between INA and McRell, executed a memorandum agreement (the "Memorandum Agreement") in which it was agreed that INA would act as the underwriting carrier of the Programs administered by McRell effective July 1, 1984, and that "[i]t is the intent of all parties that this commitment (with the exception of the rates quoted) be for a minimum of 3 years."

In late August 1984, INA prepared and submitted to McRell for execution a proposed Administrative Agency Agreement (the "Agency Agreement") between INA and McRell respecting the Programs which contained a provision enabling either party to terminate the relationship for any reason upon ninety (90) days notice. A meeting between the parties was held in late August 1984 at INA's offices in New York to discuss the proposed Agency Agreement and the inclusion therein of the 90-day termination clause. In response to an inquiry from McRell concerning INA's prior representations, including the statement in the Memorandum Agreement that INA was committed to being the underwriting carrier for a minimum of three years, Michael G. Repoli, Vice President of INA's Special Risk Facilities ("Repoli") indicated to McRell that the 90-day provision was merely a standard clause in all of INA's contracts, and that, notwithstanding the clause, INA was bound by the three-year commitment embodied in the Memorandum Agreement.

McRell executed the Agency Agreement on August 23, 1984. Under the Agency Agreement, McRell was responsible for reviewing insurance applications, analyzing the insurance risk, determining whether to accept the risk, calculating the premium rate for the risk, quoting the rate to the prospective insured or agent, processing and issuing the policy if the rate were accepted, billing and collecting premiums, sending out nonrenewal and cancellation notices where applicable, and maintaining records with respect to all of the foregoing. McRell was entitled to net commissions equal to 14% of the gross written premiums for the substantial majority of policies insured under the Programs. McRell promoted the UBOA Program to UBOA members and entered into agreements with certain local insurance agents and brokers throughout the United States ("Local Agents"). Pursuant to these agreements the Local Agents were appointed by McRell

---

1. INA had bid in 1983 to become the underwriting carrier of the Programs, but McRell rejected INA's bid because of its belief that INA's proposed premium rate structure at that time was too high.

to solicit, in their respective localities or regions, applications from UBOA members desiring to subscribe to the UBOA Program and to transmit those applications to McRell for processing. The Local Agents received commissions from McRell based on premiums written under the UBOA Program pursuant to those applications.

Among the provisions of the Agency Agreement pertinent to this dispute are the following:

—Section 2(B) granted McRell the exclusive right to service all business under the programs and precluded INA during the term thereof from entering into any competing bus insurance program, either with an administrator or insurance producer network.

—Section 3, entitled "Authority and Duties of the Administrator," set forth provisions relating to underwriting, quality of service, legal compliance, premiums, maintenance of records, reporting, advertising, policy forms and ownership of printed matter, expenses, sub-producers, and appointment of other agents. The underwriting provisions contained in Section 3(A) authorized McRell, *inter alia*, to solicit and accept insurance policies and to bind INA as underwriter with respect thereto. The provisions in Section 3(A) are prefaced by the following language:

> *Underwriting.* Subject to requirements imposed by law, the terms of this Agreement and the written instructions and limitations as may be provided by COMPANY [INA] from time to time, ADMINISTRATOR [McRell] has authority and the duty;

—Section 7(A) provided (i) that the term of the Agency Agreement was to be for three years and was to "automatically renew for successive one-year terms at the third and each subsequent anniversary of its effective date, unless either party shall have given not less than ninety (90) days' written prior notice of termination at the anniversary date to the other party" and (ii) that limits of liability, premium rates and McRell's commission were to be subject to adjustment at each annual anniversary of the Agency Agreement.

—Section 7(B) provided that each party had the right to terminate the Agency Agreement for any reason by giving the other party written notice received no less than ninety (90) days prior to the effective date of termination.

—Section 7(E) provided that in the event of termination, INA could elect one of the following options:

> (a) to have McRell continue to provide the services required under the Agency Agreement ("Run–Off Services") with respect to policies in force on the effective date of termination ("Run–Off Policies"); or

> (b) to require McRell to refund to INA that portion of commissions on premiums written but unearned on the effective date of termination and to relieve McRell of any obligation to provide further services under the Agency Agreement.

INA and McRell proceeded thereafter under the Agency Agreement to provide coverage for the UBOA and NSTA members.

*Termination of the Agency Agreement*

In January 1985, INA revoked McRell's underwriting authority for the NSTA portion of the Agency Agreement. McRell accepted the withdrawal of its underwriting authority. Both parties recognized that the NSTA Program had not been producing financial results in accordance with expectations and that it would be mutually beneficial to cease writing any further business thereunder.

In April 1985, INA officers gave McRell to believe that new rates would be set for the UBOA program effective on July 1, 1985. However, on May 2, 1985, INA sent McRell a letter "Re: Termination of Administrative Agency Agreement" ("Termination Letter") which stated:

> In accordance with *Section 7 TERM AND TERMINATION* of the Administrative Agency Agreement effective July 1, 1984, between Robert J. McRell Associates, ADMINISTRATOR, and Insurance Company of North America, you are hereby given notice that the Insurance Company of North America, COMPANY,

is terminating the Agreement effective August 1, 1985. Under paragraph E of Section 7, COMPANY elects to have ADMINISTRATOR continue to provide the services required under the Agreement with respect to policies in force on July 1, 1985.

Effective immediately upon receipt of the notice, ADMINISTRATOR is hereby instructed that the Authority and Duties specified under Section 3A of the Agreement with respect to soliciting, binding, accepting, issuing, endorsing, modifying, transferring or renewing are limited except as follows:

a. For policies with effective dates no later than June 15, 1985, only if a firm quotation has already been given and is included in a listing of Outstanding Quotes provided to COMPANY no later than May 10, 1985.

b. For renewals of existing policies only if any time period for notice of nonrenewal required by the laws of the jurisdiction governing the renewal of the policy will expire before May 10, 1985.

c. All other risks submitted to and accepted in writing by the COMPANY.

d. Modifications, changes, and endorsements to policies in force during the term of this Agreement and the term of services provided after the effective date of Termination provided such modifications, changes, and endorsements do not increase risks or exposures assumed under the policies.

During the 90–day period following May 2, a number of local agents approached McRell with new requests on behalf of UBOA members to subscribe to the UBOA Program, since during the earlier part of 1985 two other major insurance carriers for bus fleets, Transit Casualty Insurance Company and Carriers Insurance Company, had experienced serious financial difficulties and had announced that they were no longer writing insurance for bus operators. As a result of the Termination Letter, McRell was unable to consider or accept any of this additional business.

After receiving INA's May 2, 1985 Termination Letter, McRell commenced efforts to locate a new insurance carrier for the UBOA Program. INA agreed that it would assist McRell in those efforts. However, Michael Repoli told at least two such prospective insurance carriers, American Bankers Insurance Company and Progressive Casualty Company, that INA had suffered "adverse losses" under the Program.

During 1984 and 1985, INA terminated agreements to underwrite the following association programs involving property, casualty and liability lines of insurance:

(a) The New York/New England Schools Program

(b) The Recyclers Insurance Group Program

(c) The National Association of Elevators Program

(d) The Chemical Specialties Association Program

(e) The Pest Control Program

(f) The Pro–Sport Program

(g) The National Basketball Association Program

*State Regulations*

On or about September 17, 1985, the Commissioner of Insurance of the State of New Jersey adopted emergency regulations ("New Jersey Regulations") that prevented insurance carriers from cancelling or non-renewing as of that date commercial insurance policies covering insureds located in the State of New Jersey unless prior approval had been granted by the Commissioner. The New Jersey Regulations were readopted by the New Jersey Department of Insurance on or about November 16, 1985. Similarly, on or about November 1, 1985, the State of Illinois enacted legislation ("Illinois Statute") prohibiting the cancellation of casualty insurance coverage for insureds located in Illinois except for the limited reasons set forth therein.

At the time that the New Jersey Regulations and the Illinois Statute were executed, statutes in effect in Maryland ("Maryland Statutes") (i) prohibited cancellation, except under specifically prescribed notice procedures, of motor vehicle liability insurance covering Maryland insureds for any

reason other than non-payment of premiums and (ii) mandated that an insurer continue for not less than one year after termination of an agency agreement to renew through the agent any policies not replaced with other insurers as expirations occurred. At or about the same time, similar regulations, statutes and orders were enacted by various other states, and the District of Columbia (together with the New Jersey, Illinois and Maryland statutes and regulations, the "State Regulations").

*INA's Termination of McRell's Run–Off Services*

In accordance with INA's election in the termination Letter, and as subsequently confirmed by INA to McRell upon the enactment of the State Regulations, McRell performed the Run–Off Services required of it under the Agency Agreement with respect to any such Run–Off Policies renewed by force of the State Regulations. For its performance of those services, McRell continued to retain commissions based on premiums in accordance with the provisions of the Agency Agreement.

However, in a letter dated December 10, 1985 from David B. Davies of INA to Thomas Spangenberg of McRell, INA advised McRell that:

(i) McRell was not to perform any Run–Off Services under the Agreement with respect to Run–Off Policies renewed on or after January 1, 1986;

(ii) INA was unilaterally taking over sole responsibility for such business; and

(iii) the only commission that INA would pay for any such business would be 10% of the gross written premium to the particular Local Agent for the particular UBOA insured.

Davies' sending of the December 10 letter followed an INA interoffice memorandum dated November 27, 1985 from Repoli, who had been overseeing the UBOA Program. In his memorandum, Repoli, after advising that the New Jersey Regulations required renewal of UBOA Run–Off Policies in that state, wrote:

—we must eliminate McRell from all critical aspects of this program such as pricing, coverage verification, etc. and take those responsibilities in house.

—McRell is shown as our producer of record on this business and will continue as same, however, the 24% commission rate will be drastically reduced.

Since January 1, 1986, INA has underwritten and continues to underwrite renewed UBOA Run–Off Policies which, according to McRell, had aggregate gross written premiums in excess of $13 million during 1986, none of which McRell has received.

## CONCLUSIONS

*Breach of Contract*

■ Both McRell and INA have moved for summary judgment with respect to McRell's first cause of action, the alleged breach of the Agency Agreement arising out of the Termination Letter. McRell's motion will be granted in part as set forth below, and INA's motion denied.

McRell does not challenge INA's right to cancel the Agency Agreement if the 90–day notice is appropriately given. As to that issue, McRell alleges that under Section 7(B) of the Agreement, the notice was defective in that it was not received ninety days prior to the effective date thereof, having been received on May 6 and made effective August 1, 1985. New York courts, however, apply the "erroneous date rule" which provides "that a termination notice which erroneously identifies the termination date is nonetheless sufficient to effect a termination as of the first proper termination date." *G.B. Kent & Sons, Ltd. v. Helena Rubinstein, Inc.,* 47 N.Y.2d 561, 419 N.Y.S.2d 465, 466, 393 N.E.2d 460, 461 (1979). INA's notice of termination was, therefore, effective at least on August 4, 1985.

McRell's breach of contract claims is based on its contention that, contrary to the terms of Section 7(B), INA's Termination Letter instructed McRell to cease performing certain of its substantive duties as Administrator of the Programs immediately upon receipt of the Termination Letter, rather than as of the effective date of termination ninety days thereafter. Among other things, INA instructed

McRell not to solicit, accept, bind, or issue any new policies under the Agency Agreement unless the policy had an effective date no later than June 15, 1985, and "only if a firm quotation has already been given and is included in a listing of Outstanding Quotes provided to [INA] no later than May 10, 1985." McRell was additionally limited to all "other risks submitted to and accepted in writing by" INA. According to McRell, these instructions effectively nullified the 90–day notice period provided in Section 7(B). McRell argues that such an interpretation of INA's authority to terminate McRell under the Agency Agreement would make that agreement an at will, unenforceable obligation.

INA has sought to meet this challenge by referring to the language contained in the lead-in sentence to Section 3(A), which states that McRell's exercise of its duties is subject to such "written instructions and limitations as may be provided by [INA] from time to time." INA contends that the Termination Letter's elimination of McRell's authority to solicit and accept new policies was well within INA's authority to issue limitations on McRell's authority from time to time under Section 3(A).

A construction of an agreement that renders the agreement valid and operable will be favored over a construction that would render the agreement unenforceable. *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir.1970). Moreover, under New York law, mutuality of obligation is an essential element of a contract, and without it, the contract is not enforceable. *Moglia v. Geoghegan*, 403 F.2d 110, 118 (2d Cir.1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969). INA's interpretation would have rendered the Agreement unenforceable, and must be rejected.

Furthermore, New York contract law requires (i) that specific language in an agreement should take precedence over more general language therein, *see, e.g., John Hancock Mut. Life Ins. Co. v. Car-*

*olina Power & Light Co.*, 717 F.2d 664, 669 n. 8 (2d Cir.1983), and (ii) that each provision of a contract should be read to give reasonable and effective meaning to all its terms, so as to avoid leaving any particular provision without any effect or purpose, *see Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985); *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 468, 472 N.E.2d 315, 318 (1984). In the instant situation, the more specific language in Section 7(B), governing the procedure in the event of a termination of the Agency Agreement, must prevail over the more general language in Section 3(A), which subjects McRell's overall duties to such written instructions and limitations which INA might provide "from time to time." INA's interpretation would render the termination provisions of the Agency Agreement a nullity.

However, to avoid leaving Section 3(A) without any effect or purpose, the "written instructions and limitations" language must have import and can reasonably be construed to permit some limitation on McRell's authority during the ninety-day period, if not the elimination of that authority. Indeed, the Termination Letter's provision that McRell's underwriting authority was being limited to "all other risks submitted to and accepted in writing by the COMPANY" appears to require McRell to submit each application for INA's approval during the ninety-day period, a procedure which on this record cannot be deemed unreasonable.[2] No evidence having been put forth on this issue, a factual issue remains as to whether any such risks were submitted and unreasonably rejected. Therefore, in the event that McRell can establish at trial that it submitted risks to INA for approval during the ninety-day period and that INA unreasonably withheld its approval for such risks, a basis for a claim of damages remains. This interpretation of the Termination Letter reconciles INA's action under, and gives meaning to, both Sections 7(B) and 3(A), subject to the

---

**2.** Indeed, it is McRell's position that with respect to the withdrawal of its authority to underwrite NSTA policies, "McRell would have to obtain the prior consent of INA before McRell could quote and write new NSTA policies." (Plaintiff's Memorandum of Law at 12).

possible factual proof that INA unreasonably restricted McRell's authority to solicit and accept new policies during the ninety-day period.

*INA's Revocation of the Run–Off Election*

█ Pursuant to Section 7(E)(1) of the Agency Agreement, INA was accorded the right to elect one of two options in the event of termination. In the Termination Letter, INA elected to exercise option (a) to permit McRell to perform Run–Off Services with respect to UBOA Run–Off Policies. In accordance with INA's election, McRell provided the Run–Off Services required of it as Administrator under the Agency Agreement, including the collection of premiums respecting the Run–Off Policies out of which McRell retained the commissions to which it was entitled under the Agency Agreement up to December 31, 1985.

During the time that McRell was performing the Run–Off Services as set forth above, the State Regulations precluded insurance companies from cancelling or non-renewing certain types of commercial insurance coverage such as the UBOA policies written on behalf of UBOA members located in those jurisdictions. By reason of the enactment of the State Regulations, therefore, INA and McRell were legally obligated to renew the Run–Off Policies of any UBOA member desiring such renewal.

By letter dated December 10, 1985, INA advised McRell that McRell was not to perform any services under the Agency Agreement with respect to Run–Off Policies required to be renewed pursuant to the State Regulations on or after January 1, 1986 and that INA was unilaterally taking over sole responsibility for such business. The December 10 letter further stated that the only commissions INA would pay were the 10% commissions payable to the particular Local Agent.

The language in a termination clause of a contract must be enforced as written if, as here, it is not ambiguous. *Noah v. L. Daitch & Co.*, 22 Misc.2d 649, 192 N.Y.S.2d 380 (Sup.Ct.N.Y.Co.1959) (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957)). Section 7(E)(1)(a) of the Agency Agreement plainly provides that upon termination INA could elect to have McRell continue to provide services "with respect to policies in force on the effective date of termination," which, in this case, has been held to be August 4, 1985. After these policies expired, McRell's responsibility and rights would terminate. However, INA's Termination Letter stated that McRell would continue to provide services with respect to policies in force on July 1, 1985. Therefore, as an initial matter, giving full effect to the terms of Section 7(E)(1)(a) requires that the Termination Letter be interpreted as giving McRell the authority to service policies in force on August 4, 1985.

The December 10 letter from INA to McRell raises additional issues as to (1) whether INA could unilaterally revoke its election under Section 7(E)(1)(a) and (2) whether INA's election meant that McRell would continue to service policies in force on August 4, 1985 that were subsequently renewed by force of the State Regulations. As to the first issue, the November 27, 1985 interoffice memorandum from Repoli establishes that it was INA's intent to "eliminate McRell from all critical aspects of this program …," and there is no provision in the Agency Agreement to bar such a result after termination except for the Run–Off services being performed by McRell with respect to policies in effect on August 4, 1985. However, INA seeks to cut off McRell's commissions as of December 31, 1985. There is no language in the Termination Letter or the Agency Agreement which permits such a result, and INA has not offered any compelling reasons why it should be permitted to circumvent the plain language of Section 7(E)(1)(a).

INA has invoked the doctrine of frustration of contract to justify its wrongful revocation of its election under Section 7(E)(1)(a) of the Agency Agreement. However, the frustration of contract defense is available only when the circumstance that has ceased to exist was the foundation of the entire contract. *See, e.g., Pettinelli Electric Co. v. Board of Education of the City of New York*, 56 A.D.2d 520, 391 N.Y.S.2d 118, 119 (1st Dep't), *aff'd*, 43 N.Y.

2d 760, 401 N.Y.S.2d 1011, 372 N.E.2d 799 (1977) (citing *Krell v. Henry*, (1903) 2 K.B. 740, 749 (C.A.)). In the instant case, the "foundation" of the Agency Agreement was obviously the parties' mutual desire to have McRell act as administrator, and INA act as underwriting carrier, of, among other policies of insurance, the UBOA Program. Commencing July 1, 1984, McRell and INA proceeded to perform those respective functions under the Agency Agreement in accordance with that basic purpose. This foundation was not frustrated by the enactment of the State Regulations, although they may have "frustrated" INA's desire to cease having to serve as the insurer of the UBOA Run–Off Policies' and to deal with McRell in connection with those policies. INA cannot, however, invoke the defense of frustration in order to avoid its obligations under just one particular provision of the contract. Such a result would allow parties to pick and choose which of their duties under a contract they care to perform.

■ Turning to the second issue, McRell seeks to expand its Run–Off services to include any policies renewed by INA either by choice or by operation of law. There is nothing in the record to establish that INA and McRell contemplated or had any intention with respect to laws that altered the policies to bar cancellation upon expiration or required renewal. The Agency Agreement did not provide for such an occurrence, and neither INA nor McRell has advanced any reason not to apply its provisions and the intent of the parties at the time it was executed. As discussed above, the effect of INA's election under Section 7(E)(1)(a) was to have McRell continue to provide Run–Off services for the remainder of the terms of the policies in effect on August 4, 1985, but not to have McRell continue to service policies in perpetuity if such policies were extended by operation of law. Therefore, McRell is entitled to damages for INA's breach of the termination provisions of the Agency Agreement for the term of those policies in force on August 4, 1985 up to the anticipated expiration of those policies.

*Tortious Interference and Unfair Competition*

McRell's third and fourth claims allege unfair competition and tortious interference with contractual relations. As to the unfair competition claim, McRell contends that by unilaterally taking over all responsibility for UBOA policies renewed on or after January 1, 1986, INA wrongfully expropriated unto itself the business relationships, good will and reputation that McRell had developed as creator and administrator of the UBOA Program over the course of seven years. McRell also claims that by dealing directly with the Local Agents, INA knowingly and intentionally interfered with McRell's business and contractual relations with the Local Agents.

■ It is conceded that subsequent to January 1, 1986 INA sought to deal directly with the Local Agents in the states affected by the State Regulations. INA attempts to justify its acts on the grounds that (1) the direct solicitation was compelled by the State Regulations, (2) the relationship with McRell had terminated subject to the run-off provisions and (3) the identity of the Local Agents had been revealed to INA as a matter of state regulation. Central to a claim of unfair competition is the existence of bad faith. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). This record fails to establish such bad faith. More is required than simply an error in contract interpretation or a decision to minimize loss.

■ In order to establish an entitlement to damages for interference with its business relations, McRell must establish that INA's interference with the business relations between McRell and the Local Agents was done solely with the intention of harming McRell or was accomplished by dishonest or improper means. *Strapex Corp. v. Metaverpa, N.V.*, 607 F.Supp. 1047 (S.D.N.Y.1985); *Rosenberg v. Del–Mar Division, Champion Intern. Corp.*, 56 A.D.2d 576, 391 N.Y.S.2d 452 (2d Dept.1977). Similarly, to establish tortious interference with its contractual relations with the Local

Agents, McRell must establish that INA intentionally procured the breach of those contracts by the Local Agents, *see Nordic Bank P.L.C. v. Trend Group, Ltd.,* 619 F.Supp. 542, 561 (S.D.N.Y.1985), and that INA's interference was not incidental to some other lawful purpose, *see Alvord and Swift v. Stewart M. Muller Const. Co.,* 46 N.Y.2d 276, 413 N.Y.S.2d 309, 312, 385 N.E.2d 1238, 1241 (1978). Since INA sought to fulfill its obligations to its insureds—an obligation imposed by the State Regulations—without utilizing McRell's services, any harm inflicted on McRell was incidental to a valid business motive and is not part of a plan to harass McRell. There is no ground for a recovery resulting from tortious interference. *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985).

### Defamation

■ It is conceded that Repoli stated to other potential insurers that INA had suffered "adverse losses" as a consequence of the UBOA program. In connection with INA's motion for summary judgment to dismiss the defamation cause of action, it must be assumed that this statement by Repoli was false to avoid an issue of fact presented by McRell's construction of the INA internal report. Under New York law, "[w]ords are libelous without allegations of special damages 'if they affect a person in his profession, trade, or business, by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof.'" *Grimaldi v. Schillaci,* 106 A.D.2d 728, 484 N.Y.S.2d 159, 161 (3d Dep't 1984) (quoting *Four Star Stage Light v. Merrick,* 56 A.D.2d 767, 768, 392 N.Y.S.2d 297 (1st Dep't 1977). A statement as to the unprofitability of the UBOA and NSTA Programs, however, fails to impute any of the above-mentioned characteristics to McRell and is not actionable *per se.*

Further, in the absence of statements that are slanderous *per se,* damages that result from a loss of business must be pled with sufficient particularity to identify the actual losses that are claimed to flow directly from the injury to the plaintiff's

reputation. *Matherson v. Marchello,* 100 A.D.2d 233, 473 N.Y.S.2d 998 (2d Dept. 1984). In *Matherson* the Court stated that a "general allegation of a dollar amount as special damages [does] not suffice." *Matherson,* 473 N.Y.S.2d at 1001; *see also Korry v. Int'l Tel. & Tele. Corp.,* 444 F.Supp. 193 (S.D.N.Y.1978). Here, there is no particularization with respect to actual items of loss, or any evidence that the alleged defamatory remarks actually caused the injuries alleged.

■ Finally, INA's statements regarding the profitability of the UBOA and NSTA Programs were in direct response to inquiries from other insurance companies who had a common interest in the programs as potential underwriters. Where a communication is made upon a subject matter in which the speaker has an interest to another with a corresponding interest, that communication is qualifiedly privileged. *Shapiro v. Health Ins. Plan of Greater New York,* 7 N.Y.2d 56, 194 N.Y.S.2d 509, 163 N.E.2d 333 (1959); *see also Toker v. Pollak,* 44 N.Y.2d 211, 405 N.Y.S.2d 1, 376 N.E.2d 163 (1978). In order to defeat the privilege, McRell must prove not only that the statement was false, but that it was motivated by malice. *Toker v. Pollak,* 405 N.Y.S.2d at 5, 376 N.E.2d at 167. The record is devoid of any showing that Repoli's statement was motivated by malice. The statement in Repoli's November 30 memo concerning the elimination of McRell's services as part of INA's overall withdrawal from the UBOA Program does not fill this gap in the evidence.

### Fraudulent Misrepresentation

■ For the purposes of this motion, it is assumed that INA made representations in connection with the execution of the Agency Agreement to the effect that it was committed to a three-year contractual relationship with McRell. What is at issue is whether McRell has sufficiently set forth facts to establish that these representations were made with fraudulent intent and whether the representations survived the merger clause of the Agency Agreement.

According to McRell, the conflict between the ninety-day termination clause in the Agency Agreement and the three-year commitment contained in the Memorandum Agreement of late June 1984 was addressed directly by the parties prior to McRell's execution of the Agency Agreement. INA explained the termination provision as a standard clause in all INA contracts which did not reflect a lessening of its commitment to a three year term. To defeat McRell's reliance on the Memorandum Agreement, INA invokes Section 12(D) of the Agency Agreement, the "Full Agreement" provision or merger clause, which contains the standard language nullifying all prior oral or written agreements with respect to the subject matter of the Agency Agreement. There is no substantial dispute as to the meaning of the Termination Clause or the Full Agreement Clause.

Although a merger clause does not bar evidence as to representations that are fraudulent, *Hobart v. Schuler*, 55 N.Y.2d 1023, 449 N.Y.S.2d 479, 434 N.E.2d 715 (1982), the question of the reasonableness of any reliance on the representation remains. *See United States v. Wallace & Wallace Fuel Oil Co.*, 540 F.Supp. 419, 428 (S.D.N.Y.1982). Here, the language of the Agency Agreement is unambiguous. A sophisticated business entity, McRell signed the Agency Agreement with full knowledge of the possibility of termination under Section 7(B). McRell had the capacity either to reject the termination provision or to seek further relief relating to the subject. Therefore, as a matter of law, McRell was not entitled to rely on a representation flatly contradicting the express terms of the Agency Agreement.

Further, McRell has failed to establish evidence that the representation was false and made with an intent to defraud. That INA terminated other association programs prior to entering into the UBOA Program fails to establish a fraudulent intent. In addition, Repoli's deposition testimony fails to establish that the representations made during discussions concerning the Agency Agreement in August 1984 were intentionally false. At most it indicates his understanding that the three-year term provision was not particularly significant to McRell, not that in the summer of 1984 INA had no intention of completing the three-year term. No evidence has been presented that the INA decision to terminate was initiated prior to the spring of 1985.

For the reasons set forth above, McRell's motion for summary judgment on its first and second claims is granted in part and denied in part, and INA's motions for summary judgment as to McRell's third, fourth, fifth and sixth claims, as well as to the claims for punitive damages on the latter three claims, is granted.

IT IS SO ORDERED.