**ROBERT J. McRELL ASSOCIATES, INC., Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**No. 86 Civ. 0005 (RWS).**

United States District Court, S.D. New York.

Oct. 12, 1988.

As Amended Nov. 3, 1988.

Suzanne M. Berger, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City (Robert A. Wolf, of counsel), for plaintiff.

Morgan, Melhuish, Monaghan, Avidson, Abrutyn & Lisowski, New York City (Thomas A. Martin, Virginia B. Curry, of counsel), for defendant.

## OPINION

SWEET, District Judge.

The plaintiff Robert J. McRell Associates, Inc. ("McRell") sought by its complaint to recover damages from defendant Insurance Company of North America ("INA") arising out of INA's termination of its relationship with McRell in 1985. Both parties moved for summary judgment, and after the disposition of those motions, the remaining McRell claim for its share of lost premiums was tried to the court from June 29 to July 5, 1988. Final arguments and submissions were made on July 28. On the findings of fact and conclusions of law set forth below, judgment will be entered with costs for McRell.

Although the issues of contract interpretation, previously dealt with, are not without difficulty, the principal facts surrounding the dispute are not at issue. During the first six months of the one-year contract period, McRell wrote over $22 million worth of insurance policies for INA under circumstances which INA concluded made it necessary to terminate McRell's authority. The creation of the relationship between the parties and its performance, by and large, are not here in dispute. For the purposes of the present resolution, one principal factual issue is presented—whether INA by its Termination Letter and attendant conduct precluded McRell from soliciting further business in July and August of 1985. Finding that such was the effect

of INA's communications and acts results in the grant of judgment to McRell. To place that determination in context, the prior proceedings and underlying facts must be set forth.

*Prior Proceedings*

After the filing of the complaint and the completion of discovery, both McRell and INA sought summary judgment. The issues which had been raised were determined by an opinion of December 23, 1987, 677 F.Supp. 721.

The Third, Fourth, Fifth, and Sixth causes of action for unfair competition, tortious interference with contract, defamation and fraudulent misrepresentation contained in McRell's amended complaint were dismissed by the grant of INA's motion for summary judgment on those causes of action. In addition, the portion of McRell's Second cause of action which sought damages for INA's failure to permit McRell to continue servicing insurance policies that were extended beyond their regular expiration dates by operation of state law or by INA's action was dismissed. McRell's motion for summary judgment was granted in part with respect to the claims contained in its First cause of action for breach of the agreement between the parties.

The factual findings set forth in the December 23 opinion remain undisturbed by the evidence presented at trial, and those findings are hereby adopted as consistent with the facts adduced at trial as set forth below.

*The Facts*

The Parties and the Background
of the Dispute

McRell was and is a New Jersey corporation with its principal place of business located at the Middlesex Business Center, 200-D Corporate Court, South Plainfield, New Jersey. INA was and is a Pennsylvania corporation licensed to transact business in New York with offices at 1185 Avenue of the Americas, New York, New York 10036.

During the relevant period, McRell was engaged in the business of designing, promoting, administering and managing insurance programs on behalf of industry associations and of contracting with local insurance agents and brokers for the placement of insurance through McRell on behalf of subscribers to such programs. In that capacity, in March, 1979 McRell was retained by the United Bus Owners of America ("UBOA") to serve as UBOA's insurance coordinator for a period of ten years. McRell's responsibilities as insurance coordinator were to provide, maintain and develop programs of insurance beneficial to the UBOA membership. UBOA is a major nationwide association which has members in approximately 49 states and the District of Columbia. Its membership consists of operators of charter buses, municipal buses, tour and sightseeing buses, airport transportation vehicles and other passenger transportation vehicles.

In 1979, upon its retention as UBOA's insurance coordinator, McRell designed and developed an insurance program (the "UBOA Program") for the protection and benefit of UBOA members. The UBOA Program provided automobile liability, automobile physical damage, general liability, excess liability, workers' compensation and related insurance coverage to UBOA members who subscribed.

McRell negotiated with Guarantee Insurance Company ("Guarantee"), which became in September, 1979 the underwriting carrier—with McRell performing as the administrator—of the UBOA Program. As the administrator of the UBOA Program, McRell was, among other things, responsible for reviewing insurance applications received on behalf of UBOA members, analyzing the insurance risk, determining whether to accept the risk, calculating the premium rate for the risk, quoting the rate to the prospective insured or agent, processing and issuing the policy if the rate were accepted, billing and collecting premiums, sending out nonrenewal and cancellation notices where applicable, and maintaining records with respect to all of the foregoing. McRell promoted its UBOA Program to UBOA members by providing promotional materials which were distributed

at UBOA conventions and through UBOA mailing lists.

Also, as administrator of the UBOA Program, McRell entered into agreements with certain local insurance agents and brokers throughout the United States (the "Local Agents"). The Local Agents were appointed by McRell to solicit, in their respective localities or regions, applications from UBOA members desiring to subscribe to the UBOA Program, to transmit those applications to McRell for processing, and to receive commissions from McRell based on premiums written under the UBOA Program pursuant to those applications. As of September 1979, McRell had such agreements with approximately five Local Agents.

Guarantee continued to be the underwriting carrier of the UBOA Program through June 30, 1980. By that date, approximately 100 UBOA members subscribed to the UBOA Program, the amount of gross written premiums under the Program was approximately $3,750,000.00, and McRell had agreements with approximately 25 Local Agents who solicited and placed with McRell applications for insurance under the UBOA Program.

During the period July 1, 1980 through June 30, 1983, National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") was the underwriting carrier of the UBOA Program. Also during that period, McRell continued as the administrator of the UBOA Program with the same duties as before. As of June 30, 1983, the concluding date of National Union's underwriting of the UBOA Program, in excess of 1,000 UBOA members subscribed to the UBOA Program, the amount of annual gross written premiums under the UBOA Program was approximately $23,000,000 and McRell had agreements with approximately 100 Local Agents who solicited and placed with McRell applications for insurance under the UBOA Program.

In or about the latter part of 1981, McRell also became the administrator of a second insurance program, also insured by National Union, operated on behalf of members of the National School Transportation Association ("NSTA"). The program (the "NSTA Program") provided NSTA members with insurance coverage similar to that offered UBOA members under the UBOA Program. (The UBOA Program and the NSTA Program have been referred to by the parties as the "Programs").

In 1983, INA was approached about becoming the underwriting carrier for the Programs commencing July 1, 1983. McRell was introduced to INA through Don Scaglione ("Scaglione") of Contractors Planning Group ("CPG"), and INA presented a proposal to McRell in June 1983. Michael E. Repoli, Senior Vice President of INA's Special Risk Facilities Division ("Repoli") sent a letter to McRell dated June 9, 1983 in which he stated INA's interest and its desire that INA and McRell "mutually agree to a minimum of a three year program."

The INA proposal was not accepted by McRell, which proceeded to enter into an agreement with Central National Insurance Company of Omaha ("Central National") which became the underwriting carrier of the Programs administered by McRell for the period July 1, 1983 through June 30, 1984. As of June 30, 1984, approximately 1,600 UBOA members subscribed to the UBOA Program, the amount of annual gross written premiums under the UBOA Program was in excess of $27,500,000, and McRell had agreements with approximately 110 Local Agents in connection with the UBOA Program.

As of June 30, 1984, McRell's competitors in the bus and related passenger vehicle insurance market were Transit Casualty Insurance Company ("Transit Casualty"), Carriers' Insurance Company ("Carriers") and National Indemnity Insurance Company ("National Indemnity"). Also as of that date, the McRell-administered UBOA Program controlled in excess of fifty percent of that insurance market nationwide.

Because of questions about reinsurance in light of a tightening market McRell had communications during the first half of

1984 with various insurance carriers and their agents to explore their interest in becoming the underwriting carrier of the Programs under an alternative arrangement commencing July 1, 1984.

*The INA/McRell Relationship*

In June 1984, INA again made a proposal to act as the underwriting carrier of the Programs administered by McRell. INA's proposal included: (i) a commitment of a minimum of three years to the Programs, and (ii) INA's assumption of responsibility to provide reinsurance for the Programs.

In late June 1984, at a meeting in INA's offices at 1185 Avenue of the Americas, New York, New York, McRell and CPG executed a memorandum agreement (the "Memorandum Agreement") in which it was agreed that INA would act as the underwriting carrier of the Programs administered by McRell effective July 1, 1984 and that "the intent of all parties [was] that this commitment (with the exception of the rates quoted) [would] be for a minimum of three years." Pursuant to the Memorandum Agreement, effective July 1, 1984, INA became the underwriting carrier and McRell the administrator of the Programs.

In late August 1984, INA prepared and submitted to McRell for execution a proposed Administrative Agency Agreement between INA and McRell respecting the Programs which McRell and INA executed (the "Agency Agreement").

Pursuant to Section 2B of the Agency Agreement, McRell was granted the exclusive right to service all business under the Programs, and INA was precluded during the term thereof from entering into any competing bus insurance program, either with an administrator or insurance producer network.

Section 7(A) of the Agency Agreement provided that the term of the Agency Agreement was to be for three years and was to "automatically renew for successive one-year terms at the third and each subsequent anniversary of its effective date unless either party shall have given not less than ninety (90) days' written prior notice of termination at the anniversary date to the other party." It also provided that limits of liability, premium rates and McRell's commission were to be subject to adjustment at each annual anniversary of the Agency Agreement.

Section 7(B) of the Agency Agreement provided that each party had the right to terminate the Agency Agreement for any reason by giving the other party written notice received no less than ninety days prior to the effective date of termination. Section 5 of the Agency Agreement provided that as compensation for its services thereunder, McRell would receive commissions based upon enumerated percentages of gross premiums paid on the policies written under the Programs. McRell's gross commission included the commission to be retained by the Local Agents who placed insurance under the Programs with McRell. Thus, McRell's net commission on each policy was equal to the difference between the pertinent gross commission figures enumerated under Section 5 of the Agency Agreement, and the commission retained by the Local Agents. The respective amounts of the gross commission, the Local Agents' commission, and McRell's net commission for each type of policy was as follows:

| Type of Policy | Gross Commission | Local Agent's Commission | McRell's Net Commission |
|---|---|---|---|
| Automobile Liability, Automobile Physical Damage, Garage Liability, Garage-keepers Legal Liability and General Liability | 24% | 10% | 14% |
| Workers' Compensation and Employer's Liability | 10% | 5% | 5% |

| Type of Policy | Gross Commission | Local Agent's Commission | McRell's Net Commission |
|---|---|---|---|
| Excess Liability | 15% | 10% | 5% |

During the period that INA underwrote the UBOA Program, McRell had agreements with approximately 110 Local Agents nationwide, pursuant to which agreements the Local Agents had the right to solicit and place insurance policies under the UBOA Program with McRell.

Under the Memorandum Agreement and the Agency Agreement, INA and McRell agreed as to the annual average premium rates per vehicle unit that were to be obtained by McRell by the first anniversary date of the McRell–INA arrangement, i.e., by June 30, 1985. They agreed that respective average rates for the two Programs were $3,500 for the UBOA Program, as set forth in the Memorandum Agreement, and $1,100 for the NSTA Program, as set forth in the Agency Agreement. Section 12(F) of the Agency Agreement provided that the Agency Agreement was to be interpreted and construed in accordance with the laws of the State of New York.

From July 1, 1984 to December 31, 1984, the total amount of gross premiums written under the UBOA Program was $22,-587,826, nearly as much as the corresponding total for the entire preceding one-year period (July 1, 1983–June 30, 1984) when Central National was the carrier. Responsibility at INA for the daily operation of the Programs was in INA's National Association Branch Office ("NABO" Office") in Bala Cynwyd, Pennsylvania. Kevin McCracken, INA's Account Manager of the Programs ("McCracken"), and David B. Davies, INA's Resident Vice President/General Manager in the NABO Office ("Davies") were in regular communication with McRell respecting McRell's administration of the Programs and the results of INA's periodic audits of the Programs, among other things. In an INA interoffice memo dated February 12, 1985 from McCracken to Davies, McCracken stated that, with respect to the UBOA Program, "[t]he net incurred loss to net earned premium ratio is 47.7% for this 6–month period, which is encouraging."

As early as October of 1984, McRell was told that its pricing of the NSTA Program was improper and inadequate and that its underwriting authority, if it did not fulfill its contractual pricing requirements, might be withdrawn. McRell asked to retain its underwriting authority and was allowed to do so. By January 1985, an audit of McRell's performance under the Agreement revealed that the pricing of premiums for NSTA was more than $5,000,000 below that contemplated by the Agreement. Pursuant to mutual agreement, effective January 18, 1985, INA withdrew McRell's underwriting authority under the NSTA Program and McRell could quote premiums under the NSTA Program only with INA's prior approval.

From February through March 1985, the monthly average premium rates per motorized unit procured by McRell under the UBOA Program continued to increase, and the rates for each of those months was in excess of the average rate of $3,500 which McRell had agreed to procure by June 30, 1985 as follows:

| | |
|---|---|
| February 1985 | $3,605 |
| March 1985 | 4,016 |
| April 1985 | 4,380 |
| May 1985 | 4,628 |

Although the NABO office of INA regarded the UBOA Program favorably, in late 1984 and early 1985 the underwriters reporting to the Special Risk Facility at the INA home office began to have reservations, according to Repoli, the manager of the Facility. During the last four months of the UBOA Program, the underwriters and analysts at the Facility were reporting that the loss ratio on the UBOA policies was such as to jeopardize INA profits which would then affect its surplus ratios. "Allocated surplus" for an insurance company relates to its ability under the pertinent regulations to write policies.

As of November 1983, INA's NABO Office was responsible for overseeing approx-

imately twelve association programs with respect to which INA was the underwriting carrier. As of February 1986, the number of such association programs for which the NABO office was responsible had decreased to two. During the years 1984 and 1985, INA terminated agreements to underwrite the following association programs involving property, casualty and liability lines of insurance:

(a) The New York/New England Schools Program
(b) The Recyclers Insurance Group Program
(c) The National Association of Elevators
(d) The Chemical Specialties Association
(e) The Pest Control Program
(f) The Pro Sport Program
(g) The National Basketball Association Program

By late April or early May, a determination was made within INA to terminate the relationship with McRell and the UBOA underwritings, a decision that was not communicated to McRell until May 2, 1985.

*The Termination of the Relationship*

INA sent McRell a letter dated May 2, 1985 (the "Termination Letter") in which INA gave notice of termination of the Agency Agreement effective August 1, 1985. With respect to new UBOA business, INA directed in the Termination Letter that:

> *Effective immediately upon receipt of the notice*, ADMINISTRATOR [McRell] is hereby instructed that the Authority and Duties specified under Section 3A of the Agreement with respect to soliciting, binding, accepting, issuing, endorsing, modifying, transferring or renewing are limited except as follows:
>
> > a. For policies with effective dates no later than June 15, 1985, only if a firm quotation has already been given and is included in a listing of Outstanding Quotes provided to COMPANY [INA] no later than May 10, 1985.

The Termination Letter was apparently hand-delivered to McRell's office on Friday, May 3, 1985 subsequent to McRell's 5:00 p.m. office closing time. No authorized officer or employee of McRell saw the Termination Letter until Monday, May 6, 1985. The ninetieth day after receipt of the Termination Letter was Saturday, August 4, 1985.

On receiving the Termination Letter, Thomas Spangenberg, the Vice–President of McRell ("Spangenberg") called his counterparts in the NABO Office who professed no knowledge concerning the termination. Spangenberg then called Scaglione, the introducing broker, to request his assistance in setting up a meeting with Repoli to discuss the effect of the Termination Letter on McRell's authority during the 90–day termination period ending on August 1, 1985, and McRell's desire to continue its operations during the period. Spangenberg confirmed this request by letter of May 8 to Scaglione.

The requested meeting, attended by Repoli, Scaglione, Spangenberg and one or two others, took place thereafter. Repoli reviewed the Spangenberg/Scaglione letter. According to Spangenberg, McRell was directed not to write any new policies during the termination period. According to Repoli, McRell was directed not to write any new policies without INA approval. The difference in recollection, of course, is critical to McRell's claim of contract breach.

After the meeting on May 29, Repoli wrote to Scaglione confirming a telephone conversation of May 16, the meeting of May 27 and the Termination Letter. He agreed to continue McRell's authority to underwrite renewal policies effective up to July 31 at a rate of $6,900 per vehicle. The letter also stated:

> There is no authorization to quote or bind any new policies other than those quoted to May 2, 1985 and with effective dates prior to June 15, 1985.

This direction by INA differed from the instruction which INA had given McRell in connection with NSTA new business once McRell's underwriting authority under the NSTA Program was withdrawn effective January 18, 1985. In the NSTA situation, McRell had still been permitted after January 18, 1985 to solicit and accept new NSTA business, subject to INA's approval of NSTA policy quotes.

McRell's request of INA as contained in Spangenberg's May 8, 1985 letter was reiterated at meetings held at INA's offices in

late May and early June, 1985 at which representatives of McRell, INA and CPG were present. In May, INA also instructed McRell to advise the Local Agents that they should no longer solicit UBOA business, as the INA was no longer accepting applications.

Notwithstanding McRell's position, INA never rescinded, changed, amended, or otherwise modified in any respect the instructions contained in the May 2, 1985 Termination Letter. Indeed, INA personnel reconfirmed the instructions both orally at the described meetings and in follow-up letters from Repoli of INA to Scaglione of CPA dated May 24, 1985 and June 3, 1985. It was in INA's interest to preclude McRell from soliciting new UBOA business immediately upon receipt of the Termination Letter in order to preserve its surplus ratio.

Repoli and Scaglione met on the subject of the Termination Letter on June 3, and by letter of that date Repoli confirmed his May 29 letter again, referred to renewals and existing policies, and gave other instructions concerning termination. The letter contained no reference to any authority to write new policies during the period, with or without INA approval. In a June 17 internal INA memoranda on which Repoli was copied, it was stated without qualification: "No new business will be allowed to be written. The cut-off date for new business is 6/15/85."

On this subject of McRell's authority to write new business, perhaps because of his greater interest and firmer recollection, Spangenberg's testimony is more credible than Repoli's. Further, Spangenberg's recollection is strongly reinforced by Repoli's letter of May 29 and the absence of any grant of authority to write new policies with INA's approval, as well as the described letters and memo. Finally, it would have been in McRell's interest to submit such applications in order to achieve its share of the premiums, but none were submitted. According to Spangenberg, he took INA at its word. Of course, at the same time McRell was attempting to find another insurer to replace INA and presumably withheld any applications for that reason as well. The conduct of the parties during this period, however, confirms Spangenberg's version of the meeting. No testimony was obtained by either side from Scaglione on the subject of the joint meetings.

*Effect of the Termination*

Shortly prior to the sending of the Termination Letter, two of McRell's principal competitors in the passenger transportation insurance market, Transit Casualty Company ("Transit") and Carriers Insurance Company ("Carriers"), were having financial difficulties and had ceased writing such insurance. Accordingly, McRell had just begun to write new business on behalf of UBOA members who had previously written their business through Transit and Carriers, and had anticipated taking on a much more significant volume of such business commencing in May, 1985. However, as a result of INA's position with respect to termination, McRell no longer solicited or accepted any more of that new business. Although McRell proceeded to contact between forty and fifty insurance companies and/or their agents about becoming the carrier for the UBOA Program, it was unable to find a new insurance carrier for the UBOA Program.

Prior to the date of the Termination Letter, McRell had quoted new UBOA business with respect to policies having commencement dates in the month of May, 1985. Pursuant to the Termination Letter and to the INA instructions, McRell was only permitted to bind and write such previously quoted business. The volume of new UBOA business written by McRell for the month of May 1985, expressed in terms of total premiums, was as follows:

(i) May 1985 New Primary Policy [1] Premiums—$5,605,200

---

1. Primary policies included policies for automobile liability, automobile physical damage, ga- rage liability, garagekeepers legal liability and

(ii) May 1985 New Excess Policy [2] Premiums—$362,593

The commissions received by McRell with respect to this new UBOA business in May was as follows:

(i) Primary Policy Commissions—$784,728

(ii) Excess Policy Commissions—$18,130.

By reason of INA's position, McRell was only able to write new UBOA primary policies with premiums aggregating $3,759,641 for the month of June, 1985 (as opposed to $5,605,200 actually written in May 1985) on business quoted prior to the Termination Letter. With respect to that new June 1985 business, McRell earned commissions of $526,350 (as compared to $784,728 in commissions for the month of May). McRell maintained no records relating to proposed new business for June and July, although some requests for such business were received. McRell did not submit any requests to issue new UBOA policies with or without INA approval during the grace period after the Termination Letter.

By the letter dated May 29, 1985, INA required McRell to increase the premium per unit on renewal UBOA policies written for July 1985 to $6,980,00, an increase of 50.8% over the May 1985 average premium price per vehicle of $4,628.00 obtained by McRell for all UBOA business during that month on both new and renewal policies. The average premium price per vehicle obtained by McRell for July 1985 renewal business, quoted subsequent to receipt of INA's May 29, 1985 letter, was $7,546.00. Even those rates were competitive to rates quoted by assigned risk pools.

Under the UBOA Program, policy premiums were collected by McRell from the insured as follows: 20% of the total premium down upon the binding of the policy, with the balance paid by the insured in seven equal monthly installments.

Spangenberg testified that few, if any, additional expenses would have been incurred had McRell been permitted to write

general liability, with respect to which McRell's net commission was 14% of the total premium.

new policies during the grace period. No accounting records were introduced.

A report dated July 11, 1985, prepared by Hernando Madronero, a Vice President and Senior Underwriting Officer of INA ("Madronero"), which included an analysis of INA's experience with the UBOA Program, contained the following conclusions:

(i) that after computation of the ultimate projected losses for policy risks under the UBOA Program, the figures still showed a prospective net underwriting profit to INA under the Program, without consideration of investment income, of $741,127.00;

(ii) that INA anticipated prospective investment income from the UBOA Program of at least $4,000,000.00; and

(iii) that the loss experience under the UBOA Program "is developing according to plan"; and

(iv) that INA's total prospective profit, including investment income under the UBOA and NSTA Programs together, was $3,087,405.00.

Each state has a required period of notice to the insured of the intention of the insurer not to renew its policy. If the required notice is not given, non-renewal cannot be effectuated. In accordance with the terms of the Termination Letter, McRell was required to cancel the NSTA Program and non-renew the UBOA Program. The NSTA cancellation was completed within one month's time of the receipt of the Termination Letter and in a generally timely manner.

However, because of the size and complexity of the undertaking, McRell on a number of occasions missed the proper dates for non-renewal of UBOA policies. On occasion, when proper notice was not given, McRell unilaterally extended the policy period for several days to give the required notice. No premium was ever collected from the insureds for this additional exposure. INA did not approve of

2. Excess policies included policies for excess liability and workers compensation, with respect to which McRell's net commission was 5% of the total premium.

McRell's practice of extending policies several days to accomplish non-renewal which exposed INA to approximately nine years of additional insurance and which would have entitled INA to a minimum of $300,000 in premiums.

However, INA had instructed McRell to give first priority to the sending of cancellation notices under the NSTA Program, rather than the UBOA Program, and on occasion, INA failed to comply promptly with McRell's requests that INA furnish McRell with additional cancellation and non-renewal forms and comply with the legal requirements of certain states respecting such notices. Illinois, for one, required that the reason for the non-renewal be stated. The "reason" set forth in the form provided to McRell by INA for this purpose was inadequate and was rejected by the Illinois authorities, necessitating an extension of certain policies. Further, certain UBOA and NSTA policies for which McRell did send out non-renewal or cancellation notices were reinstated by operation of state law upon the passage by those states, such as Maryland, New Jersey and Illinois, of emergency orders or directives.

*Conclusions*

Subject matter jurisdiction of this action exists pursuant to 28 U.S.C. § 1332.

As previously concluded, the more specific language in Section 7(B) of the Agency Agreement governing the procedure in the event of a termination of the Agency Agreement must prevail over the more general language in Section 3(A) thereof, which subjected McRell's overall duties to such written instructions and limitations which INA might provide "from time to time." Accordingly, while Section 3(A) of the Agency Agreement may have permitted INA to impose some limitation upon McRell's authority to solicit and accept new UBOA business during the 90–day grace period, INA could not legally invoke that provision to impose unreasonable restrictions upon McRell's authority, such as the complete elimination of that authority, during the 90–day grace period. INA's position taken in the Termination Letter, and its conduct thereafter barring McRell from writing new policies, constituted an unreasonable restriction upon McRell's authority under Section 7(B) of the Agency Agreement to solicit and accept new UBOA business during the 90–day grace period.

The general language of Section 3(A) of the Agency Agreement must also yield to the more specific language contained in Section 6 which set forth the requisite conditions that had to be met before INA could suspend McRell's duties and authorities as Administrator of the UBOA Program. Under Section 6, INA could not suspend McRell's authority to "solicit, bind or issue any new or renewal business" unless: (i) McRell was delinquent in payment of funds due INA, or was otherwise in default of the Agency Agreement; and (ii) INA sent written notice to McRell advising that INA was suspending McRell's aforesaid authority by reason of McRell's payment delinquency or other default. In the absence of evidence of such delinquency or default, INA's elimination of McRell's authority to solicit and accept new UBOA business during the 90–day grace period constituted a breach of Sections 6 and 7(B) of the Agency Agreement for which INA is liable to McRell in monetary damages.

■ The preponderance of the evidence establishes that the appropriate measure of damages for INA's breach of the Agency Agreement is the amount of additional commissions which McRell would have earned on new UBOA business it would have written during the 90–day grace period, but for INA's breach of the Agency Agreement.

■ The absence of any McRell records, even as to inquiries during the grace period, while curious, does not reduce its claim for damages due to speculation. The evidence has established that the state of the bus insurance industry was such that McRell could have written its UBOA policies at the rate established for the month of May 1985, even though that month produced the largest volume of the preceding twelve. No other evidence was adduced to establish any atypicality and, therefore, May became an appropriate standard for the projection of damages suffered by

McRell as a consequence of INA's breach during the grace period.

More troublesome is the calculation presented by McRell which claims that the value of all premiums which would have been received would have been added directly to McRell's net profit, rather than to its gross. Spangenberg testified that McRell had already paid all expenses which would have been attributable to this additional underwriting. This assertion, while attacked conceptually, was not dislodged by any factual showing by INA. It was asserted by counsel for McRell in the closing argument that its financial statements had been made available to INA. This assertion was not rebutted, and INA introduced no evidence, expert, factual or otherwise to challenge McRell's somewhat astonishing claim that the theoretical premiums allocable to the grace period would have flowed without let or hindrance directly to its bottom line. On this issue McRell's evidence was barely preponderant, but none less the balance tipped in its favor.

However, the failure of McRell to perform its contractual duty properly to non-renew UBOA policies in timely fashion violated Sections 3C and 8 of the Agreement. The INA is entitled to any damages attributable to the breach of this duty. The INA net loss of premiums for the unauthorized extensions is an appropriate measure of this damage to be recovered in the INA counterclaim.

As to INA's counterclaim for its overall losses to UBOA Program, other than those attributable to the non-renewal notices, no evidence was presented on which it could be found or concluded that McRell breached any of the other terms of the Agency Agreement.

Submit judgment in accordance with these findings and conclusions with costs to McRell and interest to both McRell and INA.

It is so ordered.